# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SYLVIA WIGTON, AUDREY L. GORGONZOLA, GAIL G. HUDSON, GATHRYN DAANE, DOLORES VASSALLUZZO, MARY JANE THOMAS and THOMAS C. MARCIN, on behalf of themselves and other individuals similarly situated, | ) ) ) ) ) ) ) | Civil Action No. 2:10-cv-01768<br><br>Judge Mark R. Hornak |
| Plaintiffs, | ) ) | |
| v. | ) | |
| JOHN BERRY, Director of the United States Office of Personnel Management, | ) ) | |
| Defendant. | ) ) ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

The question before the Court is whether it has subject matter jurisdiction to entertain a lawsuit on behalf of federal retirees who assert that the Office of Personnel Management (OPM) is deliberately refusing to properly pay them the annuities to which OPM has conceded they are statutorily entitled, or whether their grievance instead must be channeled only through an administrative review scheme created by Congress. In many ways, this question goes to the heart of this Court's judicial power under Article III and the applicable statutes.

## I. BACKGROUND

The Department of Veterans Affairs ("VA") is one of the nation's largest health care providers, and operates hospitals throughout the United States that provide medical care to veterans. *See* Am. Compl. ¶ 12, ECF No. 81. Like a number of other federal employees,

registered nurses ("RNs") who are employees of the VA are entitled by statute to annuity benefits upon retirement,[1] *see* 5 U.S.C. § 8333; 38 U.S.C. § 7426. Those annuities are operated by the Office of Personnel Management ("OPM"), a federal administrative agency. 5 U.S.C. § 8347.

As of the 1980s, the annuity a part-time nurse would receive was pro-rated based on the percentage of part-time work she performed over the length of her career. *See* Pub. L. No. 96-330. On January 23, 2002, Congress passed subsection (c) of Pub. L. No. 107-135, Title I, § 132, 115 Stat. 2454 (2002) (the Department of Veterans Affairs Health Care Programs Enhancement Act, "Enhancement Act" or "Act"), which directed that all part-time work performed by VA RNs prior to April 7, 1986, was to be credited as *full-time* service rather than part-time service, effectively increasing the annuity for a number of qualifying RNs.

OPM immediately began applying the Enhancement Act to RNs who retired after its effective date, that is, after January 23, 2002. Am. Compl. ¶ 6. However, the Enhancement Act did not explicitly state whether it was to be applied retroactively, that is, whether it applied to *all* RNs who performed part-time service prior to April 7, 1986, regardless of when they retired. OPM initially took the position that the Enhancement Act was not retroactive, and refused to apply it to RNs who had retired before January 23, 2002 and who sought recalculation of their benefits under the Act. *See id.*

In 2007, approximately 160 individuals whose requests for an Enhancement Act recalculation had been denied by OPM appealed to the Merit Systems Protection Board ("MSPB"). *Id.* ¶¶ 28-29. The MSPB consolidated those 160 appeals under the lead case of

---

[1] Additionally, survivors of retirees are eligible to receive "survivor annuities" as well. *See* 5 U.S.C. §§ 8341, 8331(10)-(11). Because there is no operative difference between the eligibility of an annuitant or her survivor for the purposes of this litigation, both "annuitants" and "survivor annuitants" will be referred to collectively as "annuitants." *See* Am. Compl. ¶¶ 79, 82.

*Lippman v. OPM*, No. PH-0831-08-0212-I-1. *Id.* ¶ 31. On May 7, 2008, Administrative Judge Michael Rudisill in the Northeastern Regional Office of the MSPB issued an initial decision determining that Congress intended the Enhancement Act to be applied retroactively, i.e. to individuals who retired after April 7, 1986 and before January 23, 2002, and ordering OPM to recalculate the benefits of each of the claimants at the new Enhancement Act level, both for past and future payments. *Id.* ¶¶ 32-33. OPM requested reconsideration of Administrative Judge Rudisill's decision by a three-member panel of the MSPB, which reconsideration was declined. *Id.* ¶ 34, Ex. 1, ECF No. 81-1; *see* 5 C.F.R. §§ 1201.113-15; 5 U.S.C. § 7701. As a result, the *Lippman* decision became final and binding upon the *Lippman* claimants (and upon OPM with regard to them) as of the end of 2008. Complying with *Lippman*, OPM both paid each claimant for benefits past due, and adjusted her monthly benefit rate going forward. *Id.* ¶ 42.

According to Plaintiff's counsel, while in the wake of *Lippman*, OPM initially recalculated the benefits for a number of post-*Lippman* claimants who requested it, *id.* ¶ 43, in a number of instances in 2009 OPM did not respond to individual requests to recalculate benefits, *id.* ¶ 50. When the MSPB denies review of an initial decision, as here, that decision is only binding on the individuals before it, and does not become precedential or bind the agency with respect to future claimants. *Horner v. Burns*, 783 F.2d 196, 201 (Fed. Cir. 1986). Therefore, *Lippman* was only binding with regard to the *Lippman* claimants. However, significantly, around March 4 or March 9, 2009, OPM promulgated internally a determination that it would voluntarily apply the Enhancement Act to nurses who retired before January 23, 2002, effectively acquiescing in the *Lippman* decision. Am. Compl. ¶ 71; OPM Br. Support Mot. Dismiss ECF No. 94; *id.* Ex. 1, ECF No. 94-1.[2] Throughout this litigation, OPM has continually

---

[2] The message reads, "This notice is an update to the email issued on December 2, 2008, that advised RSP staff of how to handle inquiries from non-appellants of the *Lippman vs. OPM* decision. The decision ordered OPM to apply

confirmed that that is, in fact, its position (albeit not publicized outside of the agency), and that most tellingly it believes that it is *statutorily required* to apply the Enhancement Act retroactively.[3]

At least throughout the years of 2009-10, however, OPM had determined that it would only recalculate the benefits of a qualifying nurse who *specifically requested* recalculation under the Enhancement Act before OPM; that is, notwithstanding its acquiescence in a global application of *Lippman*, an application it posits is required by law, it would not voluntarily identify and recalculate the benefits of all RNs who are otherwise eligible for such recalculation under the Enhancement Act, nor would it voluntarily notify those individuals of their ability to seek a recalculation. *See* Am. Compl. at ¶¶ 46-49, 72, 77, 81.

On December 30, 2010, the five original named plaintiffs in this case – Wigton, Gorgonzola, Hudson, Daane, and Vallazuso – filed suit in this Court on behalf of themselves and others similarly situated against John Berry in his official capacity as Director of OPM. Those individuals were RNs and their surviving spouses who (1) worked part-time before for the VA before April 7, 1986; (2) retired between April 7, 1986 and January 23, 2002, and to whom OPM

the part-time DMS computation under Public Law 107-135 . . . to the 153 former VA nurses involved in the lawsuit. At the time, it was determined that only the 153 annuitants were affected and that inquiries from other annuitants needed to be sent to a special address. However, RSP has since been advised by the Retirement Policy Group that the new computation will apply to any VA registered nurse whose benefit was computed with the part-time DMS formula. Therefore, inquiries no longer need to be sent to room 3349. Instead they need to be handled through the normal post adjudication process." OPM Br. Support Mot. Dismiss Ex. 1, ECF No. 94-1.

[3] *See* OPM Br. in Opp. Pls.' Mot. Class Cert., ECF No. 33, at 16 n.8 ("OPM no longer takes the position that amendments enacted by [the Enhancement Act] . . . are applicable only to individuals who retired on or after January 23, 2002); *id.* at 11 ( "In light of the fact that OPM has already determined that all annuitants with part-time VA nurse service before April 7, 1986 are entitled to receive annuities with such service computed as full-time service, *no such individual will be denied the retroactive and prospective annuities using such a computation.* Therefore, no dispute exists as to whether any of the alleged class members are entitled to receive such annuity."); OPM Reply Support Mot. Dismiss, ECF No. 104, at 2 ("OPM does not dispute that an individual is *entitled to* a recalculation of his/her annuity in accordance with § 132 of Pub L. No. 107-135 . . .") (emphasis added); *id.* at 29 ("OPM, following the date of the decision in *Lippman*, adopted the interpretation that Section 132 . . . applies with full retroactivity to all persons who retired between April 7, 1986 and January 23, 2002, when the statute was enacted. That is the posture of the statutory interpretation that was in case when this case was first filed in this Court.").

did not give full-time credit for pre-April 7, 1986 part-time work when OPM calculated their VA pensions when they retired. Compl. at 1-2, ECF No. 1. They sought, *inter alia*, the certification of a class and a writ of mandamus from this Court compelling the OPM to identify annuitants eligible for a recalculation post-*Lippman*, to notify them of their rights to a recalculation, and to conduct such a recalculation. Compl. at 20-22. In between the filing of the original Complaint and the First Amended Complaint nearly a year later on December 6, 2011, however, several important events occurred.

On May 9, 2011, Plaintiffs moved to certify a class pursuant to Fed. R. Civ. P. 23. ECF No. 15. On May 11, 2011, Defendant filed a Motion to Dismiss Plaintiff's first Complaint, asserting that this Court lacked subject matter jurisdiction over the case. ECF No. 19. On December 5, 2011, Defendant's Motion to Dismiss was denied without prejudice to renew upon Plaintiff's filing a First Amended Complaint, ECF No. 79, and Plaintiff's motion for class certification was denied without prejudice to renew upon the Court's resolution of the issue of subject matter jurisdiction, ECF No. 80.

During the pendency of this litigation, OPM voluntarily recalculated the original named Plaintiffs' annuities, along with those of approximately ten (10) other retired VA nurses who were members of the putative class. Am. Compl. at 3. On June 20, 2011, Plaintiffs filed a Motion pursuant to Fed. R. Civ. P. 23(d)(1), asserting that Defendants' contacts relative to recalculation with the original named Plaintiffs and other putative class members jeopardized the class, and asking the Court to enjoin Defendant from initiating any further contact with putative class members. ECF No. 35. On November 23, 2011, the Court granted that motion and ordered OPM not to directly contact any putative class members in this case, ECF No. 75, an order which it clarified on December 16, 2011, ECF No. 87, and again on December 3, 2012, ECF No. 119,

ruling that OPM may not directly contact any putative class member only with regard to the subject matter of this litigation, and may contact such members with regard to other matters as necessary. That order remains in effect presently.[4]

During the briefing of the 23(d)(1) motion, OPM for the first time described in detail its efforts to contact potential eligible annuitants under the Enhancement Act post-*Lippman. See* ECF No. 54, filed Aug. 13, 2011. According to OPM, at the time of its acquiescence in the *Lippman* decision on March 4, 2009, it believed that given a lack of computerization of its annuity and employee information systems until very recently, the only way to identify the potential annuitants who would be eligible for a recalculation was to manually review the file of each individual annuitant who retired from the VA between April 7, 1986 and January 23, 2002, a list of approximately 78,551. Decl. Edlef J. Foelster, OPM Br. Opp. Pl.'s Rule 23(d)(1) Mot. Ex. C ¶ 13, ECF No. 54-3. It appears that given the burdens accompanying that task, OPM initially did, in fact, only recalculate the annuity of an individual who specifically requested it. *Id.* ¶ 8.

However, sometime subsequent to March 2011, OPM became aware that its annuity computer database, known as the "Annuity Roll Processing System" or "ARPS", *id.* Ex. B. ¶ 6, Decl. Amy Kathleen Benson, ECF No. 54-2, could be cross-referenced with another employee computer database, the Central Personnel Data File ("CPDF") to generate a list of potential eligible annuitants, *id.* Ex. C. ¶¶ 15-21. The CPDF was a government-wide database used to report on the Federal civilian workforce, initially designed only as a statistical database and not as a human resources tool, but containing a large amount of information on individual employees. *Id.* Ex. A. ¶¶ 5-12, Decl. Gary Lukowski., ECF No. 54-1. Additionally, the CPDF

---

[4] This civil action was reassigned to this member of the Court on December 7, 2011. ECF No. 82.

only contains information as of December 1972, and there is no comprehensive database of the federal civilian workforce before that time. *Id.* ¶ 5.

Cross-referencing the CPDF and the ARPS, OPM was able to first generate a list of annuitants who had performed part-time service as a VA nurse between December 1972 and April 6, 1986, and who retired between April 7, 1986 and January 23, 2002. *Id.* Ex. C ¶ 21. The Court will refer to the individuals so identified as "List 1" annuitants. *See id.* Of course, List 1 annuitants would almost all be eligible for a recalculation of their benefits, and would represent the vast majority of entitled annuitants post-*Lippman* concession.[5] In addition to identifying the List 1 annuitants, OPM recognized that because the CPDF did not contain data prior to December 1972, it was possible that a VA RN who performed part-time service in the time *prior to* December 1972, but who then only served full-time or intermittently *subsequent to* December 1972, would not be identified in List 1, but would also be eligible for an annuity recalculation (of course, provided she also retired in the appropriate time period). *Id.* ¶ 23. Therefore, OPM generated a second list containing all of those individuals, which the Court will call "List 2." *See id.* ¶ 24. Of course, unlike a List 1 annuitant, a List 2 annuitant would only *possibly* be eligible to an annuity recalculation, if she indeed performed part-time service prior to December 1972, and the only way for OPM to ascertain that information would be to contact the individual directly.[6] *See id.* According to OPM, prior to July 21, 2011, OPM had already begun to go through the List 1 annuitants, determined if they were entitled to an increased annuity, and issued

---

[5] OPM would have to ensure, for example, that the individual was not herself a plaintiff in the original *Lippman* decision who would have already received the appropriate recalculation. *See id.* ¶¶ 25-26.

[6] OPM has also asserted potential additional categories of individuals potentially eligible for benefits, but who would not be revealed by cross-referencing the CPDF and the ARPS: individuals who worked part-time as a VA nurse but then transferred to another agency prior to December 1972, individuals whose information was erroneously omitted from the CPDF, and individuals who worked part-time as a VA nurse but then transferred to another occupational series prior to December 1972. ECF No. 104 at 34. According to OPM, the only way to identify those individuals would be to manually inspect the records of each of the upwards of 1 million federal employees who retired between April 7, 1986 and January 23, 2002. *See id.* at 33-34.

payment to a number of them. *Id.* ¶ 27. Additionally, prior to July 21, 2011, OPM was preparing a mass mailing to the List 2 annuitants to help determine if they were eligible for a recalculation. *Id.* ¶ 28.

However, as noted above, on July 20, 2011, Plaintiffs filed their Rule 23(d)(1) motion, asking the Court to preclude OPM from making any contact with a potential class member in this case. *Id.* ¶ 29; *see* ECF No. 35. At that time, OPM ceased both of those recalculation/identification efforts pending the Court's ruling on that motion, and has apparently not re-initiated them to this date. *Id.* ¶ 29; Mot. Dismiss Hr'g Tr. 30:20-25, 21:1-5, July 23, 2012, ECF No. 112.

Plaintiffs filed a First Amended Complaint on December 6, 2011. ECF No. 81. It appears that the two current named Plaintiffs in this case are Mary Jane Thomas and Thomas C. Marcin, suing on behalf of themselves and others similarly situated with respect to the above characteristics. *See id.* ¶¶ 8-9, 69. As before, Plaintiffs identify themselves and the class as individuals who (1) worked part-time before for the VA before April 7, 1986; (2) retired between April 7, 1986 and January 23, 2002, and to whom OPM did not give full-time credit for pre-April 7, 1986 part-time work when OPM calculated their VA pensions when they retired. *Id.* ¶¶ 1-2. It is worth noting that the Amended Complaint largely repeats the allegations from the original Complaint verbatim, and does not, for example, mention OPM's intervening attempts to contact and recalculate the benefits of eligible individuals who had not self-reported to OPM. *Compare* Compl. at 2, ¶¶ 47-60 *with* Am. Compl. at 2, ¶¶ 49, 72.

Plaintiffs assert five (5) counts. Count I seeks a writ of mandamus from this Court compelling OPM to fulfill its "clear and unequivocal ministerial duty to identify Class members, notify them of their rights, recalculate their pensions, pay them benefits owing from retirement,

Plaintiffs assert five (5) counts. Count I seeks a writ of mandamus from this Court compelling OPM to fulfill its "clear and unequivocal ministerial duty to identify Class members, notify them of their rights, recalculate their pensions, pay them benefits owing from retirement, and adjust their monthly rates going forward." *Id.* ¶ 92. Count II seeks similar relief under the Administrative Procedure Act (APA), 5 U.S.C. § 706(a). *Id.* ¶ 99. Count III asserts a violation of the Equal Protection component of the Fifth Amendment to the United States Constitution, on the grounds that OPM has no rational basis for discriminating between members who self-identify as entitled to a recalculation and members who do not self-identify. *Id.* ¶ 106. It asks that the Court set aside the agency's unconstitutional action under the APA, 5 U.S.C. § 706(2)(B), and seeks "equitable relief." *Id.* ¶¶ 108-109. Count V seeks the same relief as Count III, and asserts that OPM's actions violated the Due Process Clause of the Fifth Amendment, by depriving annuitants of their property interest in their enhanced annuities without due process of law. *Id.* ¶¶ 119-120. Count IV asserts a direct action under the APA, 5 U.S.C. § 706(2)(B), for arbitrary and capricious agency action. *Id.* ¶ 116. Count VI asserts a violation of the Rehabilitation Act, 29 U.S.C. § 794, on the grounds that many putative class members are elderly and/or disabled, and that OPM has a duty to "reasonably accommodate" those individuals by conducting notification and recalculation. *Id.* ¶¶ 126-127. Also, more generally, the Amended Complaint seeks relief in the form of a declaratory judgment, *see id.* at 25-26.

The only motion pending before the Court is Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint, ECF No. 93, filed on February 10, 2012 ("Motion"). The Court has had the benefit of extensive briefing on this Motion encompassing the duration of the year 2012,[7] as well as oral argument held on July 23, 2012. As before, Defendant filed the Motion pursuant

---

[7] Perhaps sensing the significance and complexity of these issues, the parties by agreement sought a number of extensions for the filing of an out-of-the-ordinary number of briefs, along with supplemental briefing at the Court's request, through December, 2012. ECF Nos. 90, 95, 97, 108, 122, 124.

to Fed. R. Civ. P. 12(b)(1), asserting that this Court lacks subject matter jurisdiction over the present dispute.[8]

## II. STANDARD OF REVIEW

"Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). In evaluating a Rule 12(b)(1) motion, a court must first determine whether the movant presents a facial or factual attack. *Id.* When a movant brings a facial attack, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* (internal quotation omitted). The Court construes Defendant's Motion as a facial attack, because its argument is that even if true, all of Plaintiffs' allegations can and must be litigated in an alternate forum and not in this Court.

## III. DISCUSSION

By statute, OPM administers retirement annuities under both the Federal Employees' Retirement System (FERS), 5 U.S.C. § 8461, and the Civil Service Retirement System (CSRS), 5 U.S.C. § 8347.[9] Statutory provisions provide in detail how those annuities are to be computed, *see* 5 U.S.C. § 8339; 38 U.S.C. § 7426, and the manner in which they are to be disbursed, *see* 5 U.S.C.A. § 8345. These provisions, along with others surrounding individuals' claims for government benefits or privileges, have been the subject of intense scrutiny and analysis by the

---

[8] Defendants also move for a Rule 12(b)(6) dismissal for failure to state a claim only of Plaintiffs' claim for mandamus. ECF No. 93; ECF No. 94 at 3, 19. Because the Court concludes that the jurisdictional questions before it substantially predominate the "merits" questions, that some viable claims on the merits remain, and that it would be in the interests of judicial economy to decide all merits issues together at a later point in time, Defendant's Motion with respect to its 12(b)(6) attack will be denied without prejudice.

[9] Because the CSRS and the FERS are identical in the rights and remedies they afford (including CSRA review), for the purposes of this Opinion, the Court will refer to the statutes accompanying the CSRS, the older of those two systems. *See Anthony v. OPM*, 58 F.3d 620, 626 (Fed. Cir. 1995).

Supreme Court, and the United States Courts of Appeal, particularly those for the Federal and District of Columbia Circuits.

In 1978, Congress passed the Civil Service Reform Act ("CSRA"), which "comprehensively overhauled the civil service system, creating an elaborate new framework for evaluating adverse personnel actions against federal employees. It prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." *United States v. Fausto*, 484 U.S. 439, 443 (1988) (quoting *Lindahl v. OPM*, 470 U.S. 768, 773 (1985)) (internal marks omitted). The CSRA establishes that OPM "shall adjudicate all claims" relating to civil service retirement, including annuity benefits. 5 U.S.C. § 8347(a). Final decisions of the OPM are subject to review by the MSPB. *Id.* § 8347(d)(1). Appeals from a final decision of the MSPB are reviewable by the Court of Appeals for the Federal Circuit, which has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9); 5 U.S.C. § 7703. This statutory scheme "enables the development, through the MSPB, of a unitary and consistent Executive Branch position on matters involving personnel action, avoids an unnecessary layer of judicial review in lower federal courts, and encourages more consistent judicial decisions." *Fausto*, 484 U.S. at 449 (internal marks and quotations omitted). In short, "[t]he CSRA established a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2130 (2012) (quoting *Fausto*, 484 U.S. at 455). Although Defendant offers a number of legal theories in support of its 12(b)(1) motion, one primary argument undergirds them all: this Court lacks subject matter jurisdiction to adjudicate Plaintiffs' claims because they are all subject to the CSRA's review scheme, and therefore they may and must be considered through that process alone.

Before delving into OPM's arguments, it is important to make one observation regarding Plaintiffs' claims, which is that, without ruling on their merits, they appear to assert one or more facially valid constitutional claims. First, Plaintiffs argue that they have a due process interest in receiving the proper annuity dictated by statute, an interest which is violated by their failure to receive enhanced benefits under the Enhancement Act in light of OPM's *Lippman* concession,[10] or at least by their failure to be notified of such a right. Am. Compl. ¶ 81, ECF No. 1. They also point to *OPM v. Richmond*, 496 U.S. 414 (1990), which held that OPM must pay the annuity amounts set by statute, and has no authority to act otherwise. On this score, Plaintiffs are correct: an individual "acquire[s] a vested interest in his retirement annuity upon retirement," an interest that constitutes "a property interest protected by procedural due process." *McNeil v. United States*, 78 Fed. Cl. 211, 235 (Fed. Cl. 2007) *aff'd*, 293 F. App'x 758 (Fed. Cir. 2008) (citing *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 707 F.2d 548, 554 (D.C. Cir. 1983)).[11] Second, the Court notes that Plaintiff's Equal Protection claim also appears colorable, or better, *i.e.*, that if OPM determined that it would pay annuitants who self-identified, and not annuitants who did not, without any rational basis[12] for such a distinction, the Equal Protection component

---

[10] The Court takes OPM at its word in its repeated and unequivocal assertions that it believes it is *required* to apply the Act retroactively, for which the Court uses "the *Lippman* concession" as shorthand. *See supra* note 3. Therefore, at least for the purposes of this litigation, that is OPM's official statutory interpretation, either by way of the principle of judicial estoppel or by way of an agency interpretation akin to that in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). This is not a case in which OPM has asserted that it has no obligation to apply the Act retroactively, notwithstanding the *Lippman* decision; its official position has been exactly the opposite. In other words, here, OPM's own *Lippman* concession now carries the same force as the Federal Circuit's opinions as recognized in *Anselmo v. King*, 902 F. Supp. 273 (D.D.C. 1995) and *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) that became binding upon the agency once issued. *See infra* section III.B.2.

[11] Therefore, determining whether OPM's procedures indeed violated procedural due process would require an examination of "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements." *Turner v. Rogers*, 131 S. Ct. 2507, 2517-18 (2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

[12] And none has been advanced, with the possible proviso that it might be very labor-intensive to do so as to potential claimants beyond Lists 1 and 2. *See* text accompanying note 6 *supra*. The Court has not been advised of

of the Fifth Amendment could be implicated. *See, e.g., Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Again, the Court makes this observation not as a ruling of the validity of such claims on the merits, but because it sheds light on whether the *type of claim* Plaintiffs bring is one susceptible to the CSRA's exclusive remedial scheme.

## A. Sovereign Immunity

First, Defendant argues that Plaintiffs have not asserted a valid waiver of sovereign immunity to continue in this suit against the United States. "Absent waiver, sovereign immunity shields United States government agencies and their employees, acting in their official capacities, from suit." *Gary v. Pa. Human Relations Comm'n*, 497 F. App'x 223, 228 (3d Cir. 2012) (quoting *FDIC v. Meyer*, 510 U.S. 471, 475, (1994)). Defendant is correct that neither the general grant of federal court subject matter jurisdiction in 28 U.S.C. § 1331, nor the Declaratory Judgment Statute, 28 U.S.C. § 2201, independently effects a waiver of sovereign immunity. *See Clinton Cnty. Comm'rs v. EPA*, 116 F.3d 1018, 1021 (3d Cir. 1997) (§ 1331); *Muirhead v. Mecham*, 427 F.3d 14, 21 n.1 (1st Cir. 2005) (§ 2201).

However, for actions against administrative agencies, 5 U.S.C. § 702 does provide that waiver. Under the APA's waiver of sovereign immunity,

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . . Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

---

any precedent which authorizes the disregard of a conceded statutory obligation to pay earned, vested benefits on the basis that it is really hard to do so.

5 U.S.C. § 702. This case meets the first criterion, because Plaintiffs' suit is equitable and not for money damages: they "seek[] to enforce the statutory mandate itself, which happens to be one for the payment of money." *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988); *see also Zellous v. Broadhead Associates*, 906 F.2d 94, 99 (3d Cir. 1990). Additionally, our Court of Appeals has emphasized that "the waiver of sovereign immunity contained in § 702 is not limited to suits brought under the APA." *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 399 (3d Cir. 2012) (quoting *Specter v. Garrett,* 995 F.2d 404, 410 (3d Cir.1993), *rev'd on other grounds sub nom. Dalton v. Specter,* 511 U.S. 462 (1994)). "[I]t is undisputed that the 1976 amendment to § 702 was intended to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment." *Id.* at 397 (quoting *Bowen v. Mass.*, 487 U.S. at 891-92). Accordingly, § 702's waiver, which refers to "agency action," is not subject to 5 U.S.C. § 704's limitation of "final agency action," *Treasurer of N.J.*, 684 F.3d at 399, and could therefore encompass at least Plaintiffs' constitutional claims at Counts III and V brought outside the APA.

The remaining barrier to § 702's application, then, lies in its final requirement that it may not be used to supplant another statute which "expressly or impliedly forbids the relief which is sought." Defendant asserts that the CSRA is just such a statute. Therefore, the sovereign immunity/§ 702 inquiry collapses[13] into the broader statutory question: did Congress intend for the CSRA to be the exclusive avenue for adjudication of Plaintiffs' claims?[14]

---

[13] For example, the Supreme Court's thorough discussion in *Elgin,* 132 S. Ct. 2126, which considered "whether the CSRA provides the exclusive avenue to judicial review when a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional," made no mention of sovereign immunity and only examined Congress's intent in effecting the statutory scheme. *Compare id. with Fornaro v. James,* 416 F.3d 63 (D.C. Cir. 2005) (conducting similar analysis of CSRA exclusivity within the framework of sovereign immunity).

[14] Because the Court has found a waiver of sovereign immunity under § 702, it does not need to decide at this stage in the litigation whether the mandamus statutes, 28 U.S.C. §§ 1361, 1651(a), independently would provide that

## B. Exclusivity of the CSRA Statutory Scheme

Whether the CSRA (along with certain other administrative agencies' review schemes) provides a plaintiff's exclusive avenue for a claim for relief, or whether instead a United States District Court may entertain such an action, has been the subject of a great amount of judicial push-and-pull over the years.

### 1. Initial Supreme Court Cases – CSRA and Other Statutory Schemes

In *United States v. Fausto*, 484 U.S. 439 (1988), the Supreme Court closely examined the scope of the judicial review scheme of the CSRA. The Court held that a federal employee who alleged that a 30-day suspension was imposed upon him in violation of the procedural regulations of his employing agency could not bring a claim under the Tucker Act based on the Back Pay Act, 5 U.S.C. §§ 1101 *et seq.*, 3132(a)(2); 28 U.S.C. § 1491, on the grounds that the CSRA provided the exclusive avenue for "reviewing personnel action taken against federal employees." 484 U.S. at 455.

Additionally, the Supreme Court considered similar challenges to the actions of other administrative agencies. In *Heckler v. Ringer*, 466 U.S. 602, 604 (1984), the Supreme Court held that individuals who challenged the Secretary of Health and Human Services' (HHS) ruling that a certain type of surgery was not compensable under the Medicare Act, 42 U.S.C. § 1395 *et seq.*, on the grounds that the agency had not followed certain procedures in making that ruling, had to exhaust their remedies at all administrative levels before seeking a remedy in District Court. The Court reasoned that, rather than asserting claims "wholly collateral to their claim for benefits under the Act," *id.* at 619, Plaintiffs' claims were not "anything more than, at bottom, a

---

waiver, nor whether mandamus is an appropriate remedy in this case. *See, e.g., In re Briscoe*, 448 F.3d 201, 212 (3d Cir. 2006) (mandamus under § 1651(a)); *Omar v. Mueller*, 501 F. Supp. 2d 636, 639 (D.N.J. 2007) (mandamus under § 1361).

claim that they should be paid for their BCBR surgery," *id.* at 2021. The Court would later distinguish *Heckler* (implicitly and explicitly) in two subsequent cases.

First, in *Bowen v. City of New York*, 476 U.S. 467 (1986), the Court unanimously held that a District Court could hear, without requirement of exhaustion of remedies, a class action claim that the Social Security Administration had denied individuals benefits due to an "unlawful, unpublished policy" of placing oppressive procedural burdens on claims for mental impairment benefits. *See id.* at 474. The Court emphasized that plaintiffs' claims were "collateral to the claims for benefits that class members had presented administratively," *id.* at 483, and constituted a challenge to a "systemwide, unrevealed policy that was inconsistent in critically important ways with established regulations," *id.* at 485.

Second, in *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) the Court held that immigrants could assert in the district court, rather than through the Immigration and Nationality Act's (INA) administrative review process (which never would otherwise include district court review), claims that the Immigration and Naturalization Service's application review process for alien farmworkers' amnesty was conducted in an arbitrary and unlawful manner. Distinguishing *Heckler*, the Court noted that plaintiffs were not challenging "individual denials of SAW status," for which the INA's procedures were exclusive, but rather were asserting "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.* at 492, 494-96. Additionally, it was important to the Court that under the INA scheme in place, the only other way for an individual to achieve judicial review of the denial of his SAW status would be if the individual was later apprehended and deportation proceedings were initiated – "[q]uite obviously, that price is tantamount to a complete denial of judicial review for most undocumented aliens." *Id.* at 898. The Court similarly relied on a prior case

permitting judicial review, *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1998), observing that if its holding in that case were otherwise, "there would [have been] 'no review at all of substantial statutory and constitutional challenges to the Secretary's administration of Part B of the Medicare program.'" *Id.* at 497 n.14 (quoting *Bowen v. Michigan Academy*, 496 U.S. at 680).

### 2. *Lower Court CSRA Cases*

Two lower courts then considered cases with facts very similar to those here. In *Anselmo v. King*, 902 F. Supp. 273 (D.D.C. 1995), as here, the court considered a class action lawsuit against OPM. In *Wassenaar v. OPM*, 21 F.3d 1090 (Fed Cir. 1994), the Federal Circuit had held that OPM had been wrongly calculating annuities paid to a certain category of spouses of federal law enforcement officers at a level lower than it should have, and ordered OPM to recalculate the annuity of the petitioner before it at a higher rate. After that opinion was issued, the *Anselmo* plaintiffs alleged that OPM was not fulfilling its statutory duty in determining which other individuals were eligible for a recalculation increasing their annuities under the application of *Wassenaar*, and sought from the district court a writ of mandamus compelling OPM to identify eligible individuals, notify them of their eligibility, and recalculate their annuities. *See* 902 F. Supp. at 275. As here, OPM moved to dismiss for lack of subject matter jurisdiction, arguing that the CSRA provided the exclusive avenue to seek a recalculation of annuities. *Id.* Relying heavily on *Bowen v. NYC*, 476 U.S. 467, Judge Robertson ruled that the district court did have subject matter jurisdiction, in particular over a mandamus action compelling OPM both (1) to recalculate eligible individuals' annuities, and (2) to notify eligible survivor annuitants.

902 F. Supp. at 277-278,[15] and that court subsequently oversaw OPM's efforts to fulfill those obligations.

A decade later, in *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005), the Court of Appeals for the D.C. Circuit considered a case highly analogous to *Anselmo*, in which annuitants sought from OPM a recalculation to which they were entitled according to a Federal Circuit case, *Pitsker v. OPM*, 234 F.3d 1378 (Fed Cir. 2000), filing a class action and seeking mandamus relief. With then-Judge (now Chief Justice) Roberts writing for the panel, the court held that the APA's waiver of sovereign immunity in 5 U.S.C. § 702 was not available to plaintiffs because the CSRA prohibited the relief they sought. *See* 416 F.3d at 65-67. The court distinguished *Bowen v. NYC* and *McNary*, noting that "the statutorily mandated administrative process did not address the sort of procedural and constitutional claims the *McNary* plaintiffs sought to bring in district court, and so did not preclude them;" by contrast, the plaintiffs before it were seeking a decision "on the merits of the plaintiffs' claims for benefits." *Id.* at 68 (citing 498 U.S. at 493). Turning to the question of whether mandamus relief (which the court concluded could afford the requisite waiver of sovereign immunity) might be available to the plaintiffs, the court first observed, "[b]ecause the plaintiffs do not now contend that OPM has a duty to notify annuitants about enhanced benefits that may be enforced through mandamus, the *sole issue* here is whether mandamus is available to compel OPM to pay all annuitants enhanced benefits owed under

---

[15] The court did not, in that opinion, rule on "whether a declaratory judgment will issue or whether this Court will grant relief in the nature of mandamus." 902 F. Supp. at 278. After the court issued its opinion regarding subject matter jurisdiction, the court convened a status conference, at which OPM decided to voluntarily notify annuitants eligible for recalculations under *Wassenaar* (and a related case of *Moore v. OPM*, 113 F.3d 216 (Fed. Cir. 1997)), and established a schedule for the notifications and recalculations. *See Anselmo v. King*, Civ. A. No. 94-0895, slip op. (D.D.C. Mar. 18, 1998), *available at* Pls.' Resp. Mot. Dismiss Ex. D, ECF No. 99-4. The *Anselmo* court required that OPM continually notify the court of its progress, and noted that "if OPM's ongoing notification process has its intended effect, this Court's writ may have run as far as it can." *Id.* at 4. When it appeared to the court's satisfaction that OPM had satisfactorily completed that task, it issued a show cause order why the case should not be dismissed. See *Anselmo v. King*, Civ. A. No. 94-0895, slip op. (D.D.C. Sep. 30, 1999), *available at* Pls.' Resp. Mot. Dismiss Ex. E, ECF No. 99-5.

18

*Pitsker.*" *Id.* at 69 (internal citations omitted) (emphasis added). The court proceeded to answer that question in the negative, reasoning that each individual annuitant had before him an adequate remedy in the form of presenting a claim to OPM through the CSRA process and seeking review of it there. *Id.* Therefore, the court dismissed the claim for lack of subject matter jurisdiction.

### 3. Elgin

Most recently, the Supreme Court considered the breadth of the exclusivity of the CSRA scheme in *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126 (2012). The *Elgin* plaintiffs were a group of male federal employees who had challenged in district court their discharges on the grounds that they had failed to register for the Selective Service as required by 5 U.S.C. § 3328 and 50 U.S.C. § 453, arguing that § 3328 was an unconstitutional bill of attainder and unconstitutionally discriminates based on sex when combined with the Selective Service Act's male-only registration requirement. *Id.* at 2131. Resolving a circuit split, the Court held that the CSRA provides the exclusive avenue to judicial review when a qualifying employee challenges an adverse employment action by arguing that a federal statute is unconstitutional.

The Court analyzed the question before it under the framework of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), asking whether it was "'fairly discernible' from the CSRA that Congress intended covered employees appealing agency actions to proceed exclusively through the statutory review scheme, even in cases in which the employees raise constitutional challenges to federal statutes." 132 S. Ct. at 2132-33. First, the Court examined the CSRA's text, structure, and purpose, reiterating its observations in *Fausto* regarding Congress's intent to create an exclusive remedial scheme for the challenging of adverse employment actions, and noting that it could nowhere be discerned from the statute's text and purpose that Congress

sought to exempt constitutional claims, as opposed to any other type of claim from the CSRA's purview. *See id.* at 2133-35. Concluding, the Court observed, "the better interpretation of the CSRA is that its exclusivity does not turn on the constitutional nature of an employee's claim, but rather on the type of the employee and the challenged employment action." *Id.* at 2135.

Second, the Court examined whether any factors were present that would indicate that Congress did *not* intend the plaintiffs' claims to be reviewed only within the CSRA scheme, namely, the "presumption that Congress does not intend to limit district court jurisdiction [1] if a finding of preclusion could foreclose all meaningful judicial review; [2] if the suit is wholly collateral to the statute's review provisions; and [3] if the claims are outside the agency's expertise." *Id.* (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3150 (2010) (quoting *Thunder Basin*, 510 U.S. at 212-13)) (internal marks omitted). Regarding (1), the Court reasoned that under the CSRA scheme, the Court of Appeals for the Federal Circuit would still be fully able to hear and adjudicate the constitutional challenges of aggrieved individuals, even if the MSPB could not decide the constitutional issue below, preserving the availability of meaningful judicial review. *Id.* at 2136-39. Moving on to (2), the "wholly collateral" argument, relying on *Heckler*, 466 U.S. at 614, the Court observed that

> petitioners' constitutional claims are the vehicle by which they seek to reverse the removal decisions to return to federal employment . . . . A challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme . . . . Far from a suit wholly collateral to the CSRA scheme, the case before us is a challenge to CSRA-covered employment action brought by CSRA-covered employees requesting relief the CSRA routinely affords.

*Id.* at 2139-40. Finally, the Court found the third factor also absent, because certain employment-related questions such as whether plaintiff suffered a "constructive discharge" were still within the agency expertise, and that expertise still could be "brought to bear" on an appeal.

*Id.* at 2140. Writing for three Justices, Justice Alito penned a forceful dissent, in which he argued, *inter alia*, that at least facial constitutional challenges such as those asserted by the *Elgin* plaintiffs indeed fit the "wholly collateral" bill, given that they are unrelated to the statutory rules of federal employment, and lack detailed factual issues pertaining to specific circumstances from which employee grievances arise. *Id.* at 2143 (Alito, J., dissenting).

### 4. *Application of Precedent to the Present Case*

The crux of the issue before this Court is what kind of challenge to OPM action, if any, may be brought in district court after *Elgin*? For the reasons that follow, the Court concludes that Plaintiffs here have presented at least one sort of attack that does survive.[16]

First, properly applying *Elgin* to this case requires that the claims here be viewed across three main (3) axes: the type of claim, the type of plaintiff, and the type of relief sought. First, the Court must first consider the nature of Plaintiffs' claims. As noted above, Plaintiffs assert a facially colorable constitutional attack to OPM action: that its refusal to recalculate their annuities in light of its avowed declaration of, and acquiescence in, an obligation to do so, or to at least notify them of that acquiescence and of their right to seek such a recalculation, results in a denial of their property interest in their annuities without due process of law and/or violates equal protection. *See* Am. Compl. at 25(E) (listing each action as violating OPM's obligations).[17]

Second, the Court must consider the particular groups of Plaintiffs/putative class members. The potential annuitants on whose behalf the Plaintiffs seek relief can be fairly

---

[16] Also, it appears that even after *Elgin*, attacks to OPM rulemaking that does not affect any individual employee, and therefore would fall far outside the CSRA's purview, would still be available. *See, e.g., Nat'l Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63 (D.D.C. 2009).

[17] In light of the Court's conclusion that Plaintiffs' constitutional claims lie within the Court's subject matter jurisdiction (and fall under *Elgin*'s analytical rubric) it need not, and therefore does not, express an opinion relative to Plaintiff's claims in the remaining counts.

divided into two categories: putative class members who are aware of OPM's *Lippman* concession, and therefore of their right to increased annuities (which would include the named Plaintiffs, for example), and putative class members who are entirely unaware of those circumstances, and are necessarily absent from the litigation. *See* Am. Compl. ¶¶105-106.

Third, with regard to those asserted duties and individuals, the relief they seek can further be parsed. In accordance with what they assert are OPM's duties, Plaintiffs seek on behalf of all putative class members that OPM (a) *recalculate* their benefits and pay them their enhanced annuities and with respect to the unknowing putative class members, Plaintiffs seek an order that OPM (b) *notify* them of their potential right to seek such a recalculation.

With these classifications in mind, the Court turns to their analysis under the relevant case law. Because, as noted above, each of Plaintiffs' constitutional challenges presents a colorable constitutional claim as in *Elgin*, the *Thunder Basin* analysis is appropriate here. *See Elgin*, 132 S. Ct. at 2132. In the first step of the *Thunder Basin* analysis, the Court must examine the text, structure, and purpose of the CSRA to determine whether it is "fairly discernible" that Congress intended the claims here to be adjudicated in the CSRA scheme. *Elgin*, 132 S. Ct. at 2133. Here, the text of the CSRA is silent with regards to the particular scenario of how annuities are to be "recalculated" in the event of a retroactive Federal Circuit opinion, statute, or agency concession.[18] However, the CSRA does state that OPM "shall adjudicate all claims under this subchapter [entitled "Civil Service Retirement"]", 5 U.S.C. § 8347(a); and "an administrative action or order affecting the rights or interests of an individual or of the United States under this subchapter may be appealed to the [MSPB]", *id.* § 8347(d)(1), a seemingly broad statutory grant of authority over annuity-related matters. Additionally, this Court is

---

[18] However, the statute and regulations do speak to the particular scenario of termination of annuity payments, for example, which under law must be accompanied by notice and contain a special appeal procedure. *See* 5 U.S.C. §§ 8311-22; 5 C.F.R. §§ 831.109; 831.1104.

mindful of the Supreme Court's emphasis of Congress's purpose in establishing the CSRA: "to replace an 'outdated patchwork of statutes and rules' that afforded employees the right to challenge employing agency actions in district courts across the country.'" *Elgin*, 132 S. Ct. at 2135 (quoting *Fausto*, 484 U.S. at 444-45). This broad statutory grant, as illuminated in *Elgin* and *Fausto*, might facially counsel in favor of exclusive CSRA review with respect to all of the claims, categories of Plaintiffs, and relief sought here.

However, a closer examination counsels against that more sweeping conclusion. Turning to the types of plaintiffs here – individuals who know of their rights post-*Lippman* and individuals who do not – as to the first group, Congress provided an effective system to challenge the agency actions taken against them in the form of the CSRA. They would simply present their claim to OPM asserting their entitlement to an increased benefit post-*Lippman*; if the claims are denied, they may appeal to MSPB and then to the Federal Circuit; if the claim is granted, they receive their pay and are satisfied. In relevant aspect, then, these individuals are like the *Elgin* plaintiffs: they can receive complete review of their claims through the CSRA scheme, culminating in Federal Circuit review. The relief they seek – recalculation – is specific to each of them and is entirely within the agency's authority. Therefore, in light of *Elgin*, the Court does not have difficulty concluding that at least as far as an individual's claim for benefits to which she is entitled under the law, that is, an individual's recalculation, including for reasons such as those asserted here, Congress did indeed intend for an individual to present that claim through the CSRA's scheme, and not attack it collaterally in district court.

But as to the second group of individuals, who never know of their rights or the Lippman *concession*, and whom OPM neither notifies nor recalculates, the CSRA scheme is *necessarily*

unavailable to them.[19]  As noted above, that individual could be provided two remedies: (a) OPM could on its own recalculate her annuity and begin paying her appropriately, or (b) OPM could notify that individual of her ability to request a recalculation from OPM.  While at first blush, it might seem that a district court should be able to compel both remedies (a) and (b) where judicial review of that action would be otherwise unavailable, the *Fornaro* court explicitly considered the remedy in (a), and held that the "connection between the relief sought in the judicial action and that available in the administrative process" was "far closer" than that in *McNary*, and held it was squarely foreclosed by the CSRA.  416 F.3d at 68.  Here, the Court finds the *Fornaro* court's ruling on that count to be confirmed by *Elgin*, which focused on the fact that an aggrieved individual could acquire through the CSRA the remedy he sought, backpay and reinstatement. *See Elgin*, 132 S. Ct. at 2140.  But the fact that the Court may not grant the greater relief does not mean that it also is powerless to grant the lesser.  Therefore, what remains for the Court to consider is the form of relief explicitly not addressed in *Fornaro*, and not presented to the Supreme Court in *Elgin*: (b) the relief of notification, as it applies to individuals who do not know of their rights under the Act, as now defined by OPM because OPM never told them, or perhaps more critically, of OPM's *Lippman* concession coupled with its refusal to make that concession known to the group of annuitants who could benefit from it, if they simply asked.

The Court considers this form of relief under three *Free Enterprise Fund* factors discussed in *Elgin* that counsel against exclusivity.  While the Supreme Court has expressed the three factors in the conjunctive rather than the disjunctive, lower courts have observed that "[of] the three factors, the first seems the most important; and indeed that a plaintiff's constitutional claims can be meaningfully addressed in the Court of Appeals trumps other considerations such

---

[19] In this way, OPM's approach – providing recalculation only to those that know to ask – might be viewed as its own version of "double secret probation," that is, something that would matter greatly to those it affects, but whose effect they cannot appreciate because they don't know that it is affecting them.

24

as that administrative review is conducted internally rather than independently and that the reviewing body lacks expertise in reviewing constitutional questions." *Altman v. U.S. S.E.C.*, 768 F. Supp. 2d 554, 559 (S.D.N.Y. 2011) *aff'd,* 687 F.3d 44 (2d Cir. 2012) (quoting *Free Enterprise Fund*, 130 S. Ct. at 3150) (internal marks and citations omitted).

The first and most important *Free Enterprise Fund* factor cuts sharply in favor of district court review here: denying it indeed "could foreclose all meaningful judicial review." *Elgin*, 132 S. Ct. at 2136. As noted above, when one considers an individual who actually knows of their right to a recalculation of their annuities, that person most clearly has an avenue for meaningful judicial review via the CSRA processes culminating in a visit to the Federal Circuit. As to that case, *Elgin* tells us the answer. She simply presents a claim before OPM asserting her entitlement to an increased benefit post-*Lippman*; if it is denied, she may appeal up to the Federal Circuit. The CSRA plainly affords her meaningful judicial review of her claim. But consider an individual who does not know of her entitlement or of OPM's concession of entitlement. Indeed, it is extremely likely that an individual would be entirely unaware of her entitlement, given the fact that OPM's acquiescence in *Lippman* happened by way of an internal agency memorandum, which as far as this Court is aware, was never publicly revealed before its inclusion as an Exhibit appended to a filing on the docket of this very case, ECF Nos. 20-1; 94-1. By no fault of her own, that individual would have no way of knowing of the *Lippman* concession, and therefore would have no way of availing herself of the CSRA's remedial scheme. It is that particularity that puts her in a wholly different posture from the individuals in *Elgin*, who were obviously on notice that they were aggrieved by agency action when they were discharged, and who therefore were truly able to seek review of that action (including review raising constitutional claims) through the CSRA mechanisms. It puts this case far closer to the

scenarios of *Bowen v. NYC* and *McNary*: individuals challenging "systemwide, unrevealed polic[ies]" they would have no way to otherwise know about, and with an inability to otherwise seek judicial review of the wrongs they suffered. *Bowen v. NYC*, 476 U.S. at 485.

To put it another way, the Supreme Court has never held that the CSRA provides the exclusive remedy for an agency position that is both systemwide *and* secret. *Elgin* considered a policy that was systemwide, but anything but secret (enshrined in statute; injury known by aggrieved individual). *See generally* 132. S. Ct. 2126. So did *Heckler*. *See* 466 U.S. at 614 (challenging Secretary's issuance of formal ruling). *Fausto* considered agency action that was both open (agency regulation required notice of grievance procedures; injury known by aggrieved individual) and individualized. *See generally* 484 U.S. 139. Even the OPM obligation in *Fornaro* was a more open one than here – it was explained in a published Federal Circuit opinion – although an individual would still not likely have reason to know she was being aggrieved given the long time period between her initial receipt of annuity upon retirement and the subsequent recalculation of her benefits. *See generally* 416 F.3d 63. But the hallmark of a systemwide *and* secret policy is that the very reason that it may be unconstitutional (i.e. that it denies procedural due process and/or equal protection) is *because* it deprives a substantial swath of individuals of the benefit of review within the CSRA. *See Bowen v. NYC*, 476 U.S. at 474, 485 ("Respondents contend that the failure to make the policy known to claimants denied the individual plaintiffs and class members due process of law"). *Elgin* simply does not address that kind of a case.

Equally importantly, the CSRA itself does not provide *any* mechanism by which that unknowing individual could receive the notice to which she may be due. An individual without notice of OPM's *Lippman* acquiescence of course cannot on her own avail herself of the CSRA

scheme, because she doesn't know that she needs to; therefore, the only way she could get relief is if another individual asserts it on her behalf. But even according to OPM, a deserving individual who actively requests a post-*Lippman* recalculation before OPM will receive one. OPM Class Cert. Opp. Br. at 11, ECF No. 33. Therefore, *that* individual (the one who asks for and receives recalculated benefits) cannot ever become an appellant, either before the MSPB or the Federal Circuit, because she will have received what she is asking for, and would not have standing (let alone the motivation) to serve as an appellant. Moreover, even if a claimant appealed an OPM decision after not prevailing below, *that* individual could not represent an absent unknowing claimant at the MSPB. This is because while the MSPB allows for the consolidation of appeals, it does not allow for the certification of a class action for benefits as a district court does.[20] The MSPB itself has ruled that it cannot certify a class of appellants including putative class members who have not presented claims before OPM, because it lacks jurisdiction over then. In *Wassenaar v. OPM*, 55 M.S.P.R. 517, 521-22 (1992), *rev'd on other grounds by* 21 F.3d 1090 (Fed Cir. 1994), the MSPB denied a petition to certify a class comprising absent, unknowing class members who had not yet filed claims with OPM, explaining, "[i]t is well settled that the [MSPB] has appellate jurisdiction over OPM's determinations . . . only after OPM has issued a final decision, that is, a reconsideration decision,

---

[20] MSPB regulations permit "Class appeals." 5 C.F.R. § 1201.27. Although the regulation does state that the MSPB in making its decision should be "guided but not controlled by the applicable provisions of the Federal Rules of Civil Procedure," which would include Fed. R. Civ. P. 23, it also speaks to the joinder of individual *appellants'* claims: "When a class appeal is filed, the time from the filing date until the judge issues his or her decision . . . is not counted in computing the time limit for individual members of the potential class to file individual appeals." *Id.* None of the cases cited by OPM supports the proposition that MSPB may authorize a class action including absent/non-appellant class members. *See Jude v. Dep't of Treasury*, 52 M.S.P.R. 5, 6-7 (1991) (discussing "*appellants* identified as potential members of the *Hennessy* class) (emphasis added); *Cheeseman v. OPM*, 21 M.S.P.R. 118, 127-28 (1984); *Adzell v. OPM*, 89 M.S.P.R. 88, 92 (2001); *Bacon v. HUD*, 20 M.S.P.R. 408 (1984); *Watson v. Dep't of Navy*, 86 M.S.P.R. 318, 321 n.3 (2000), *aff'd*, 262 F.3d 1292 (Fed. Cir. 2001).

concerning those rights or interests."[21] Nor does this Court have before it any reason to believe that the Federal Circuit, sitting as an appellate court over the MSPB, could create and then supervise a class under Fed. R. Civ. P. 23 where the MSPB could not.

These realities also distinguish this case from *Elgin*. There, the Supreme Court observed that although the MSPB may not have the ability to rule on constitutional issues, it could still develop the adequate record for consideration of them by the Federal Circuit, which remained "fully competent to adjudicate" constitutional issues even if they had not been presented below, because the Federal Circuit's "authority to decide particular legal questions is [not] derivative of the MSPB's authority." 132 S. Ct. at 2136-37. Here, the Federal Circuit could *never* be able to adjudicate the constitutional claims relating to an absent putative class member, because that individual would necessarily never herself stand before that court, nor could another similarly situated individual do so on her behalf by way of an MSPB class action. In other words, the *Elgin* plaintiffs could receive a decision on the merits by the Federal Circuit; a plaintiff here would never get to its doors. Therefore, this factor weighs strongly against exclusivity of CSRA review.

Regarding factor (2), the Court does note that *Elgin* dealt a blow to the "wholly collateral" arguments relied on by the Court in *Bowen v. NYC*, 476 U.S. at 483, and *McNary*, 498 U.S. at 497-98: as long as at the end of the day, an individual seeks relief of the ilk the CSRA scheme ordinarily adjudicates, regardless of the "systemwide" nature of his grievance with OPM, her claims are not "collateral" to the CSRA scheme. *See* 132 S. Ct. at 2139-40. But as explained before, Plaintiffs seek the relief of notification separate and apart from the relief of

---

[21] In that decision, the MSPB declined to waive the requirement of exhaustion for those absent, unknowing class members. *See* 55 M.S.P.R. at 521-23. Applying the reasons for the MSPB's denial of waiver of exhaustion in *Wassenaar* to the facts of this case offers no basis for this Court to conclude that the MSPB would waive exhaustion in a case brought by the putative class members here. *See id.*

recalculation.[22] Notification is indeed "collateral" to the individual determination of benefits: it is not a remedy recognized by the CSRA scheme, as a calculation of annuities would be. As just explained, it is necessarily outside of a scheme that only considers appeals from those who have themselves brought their grievances before OPM. Therefore, this case is different from *Elgin*, in which plaintiffs were seeking "reinstatement, backpay, and attorney's fees . . . precisely the kinds of relief that the CSRA empowers the MSPB and the Federal Circuit to provide." 132 S. Ct. 2126.

Finally, factor (3) also does not counsel in favor of exclusive CSRA review. The agency's expertise here would lie in determining whether an individual is the type of person who would be eligible for relief under the Enhancement Act, and calculating the proper annuity due that individual. The agency has already done the former, and the Court reiterates that it cannot compel OPM to undertake the latter, post *Elgin*. That is, OPM has already explained that it has identified the List 1 and List 2 individuals, and the Court has already determined that ordering the recalculation of individual benefits is outside its purview. All that remains is sending those individuals a notification letter, something that the Court does not consider to require any agency expertise. Additionally, the core constitutional question, whether due process or equal protection requires the sending of notification letters, lies outside the agency's expertise. *See Elgin*, 132 S. Ct. at 2140. And, unlike the case in in *Elgin*, the agency's experience would not be "brought to bear" in considering questions of factual or statutory interpretation that might otherwise dispose of an individual claim, because resolution of individual claims are no longer at issue. *Cf. id.*

---

[22] Am. Compl. at ¶ 95 ([T]his Court should direct OPM to identify and notify Class members of their entitlement, recalculate their pensions . . . pay benefits past due, and adjust monthly pension benefits going forward); *id.* at 25 ("WHEREFORE, Plaintiffs respectfully request that this Court . . . E. Declare that OPM has violated its obligations under [the Act and its *Lippman* acquiescence] by failing to identify and notify members of the putative Class, recalculate their pensions, and pay them amounts owed under the [Act]; F. Order OPM to perform its obligations under [the Act and its *Lippman* acquiescence], and identify all Class members entitled to recalculation, recalculate their pensions in accordance with the [Act] . . . L. Provide the Named Plaintiffs with a complete list of all living and deceased members of the Class, which includes their last known address and telephone number . . .").

In sum, to require CSRA review as to all relief sought in this case "could foreclose all meaningful judicial review" of the serious constitutional questions presented by the Plaintiffs on behalf of those who have not been notified of their rights, is collateral to the CSRA's review mechanism, and does not implicate agency expertise.[23] Therefore, the Court concludes that it is "fairly discernible" that Congress would have not required this type of question to be subjected to CSRA review, namely, whether it violates annuitants' rights under the Due Process Clause or Equal Protection for OPM to refuse to notify all arguably covered individuals of their eligibility for a recalculation of benefits to which OPM has determined they are statutorily entitled, given that it has refused to provide notice and recalculate those benefits of its own accord.[24]

However, the Court must emphasize the narrowness of its holding. As noted above, fairly read, *Elgin* sets out a broad standard, one that almost entirely encompasses the universe of claims relating to an individual federal employee's rights or entitlements.[25] Accordingly, notwithstanding OPM's *Lippman* concession that the Enhancement Act requires it to do so, this

---

[23] Given this Court's conclusion that constitutional review might not be available at all to some of the Plaintiffs here, absent this Court's narrow exercise of jurisdiction, it may well be that this case falls within the range of a "statute that purports to deny any judicial forum for a colorable constitutional claim" and would therefore fall under the rubric of *Webster v. Doe*, 486 U.S. 592, 603 (1988), which requires a "heightened showing . . . to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim," rather than the lesser "fairly discernible" standard of *Thunder Basin*, 510 U.S. at 207, that applies when the statute "channels judicial review" to a particular court. *Elgin*, 132 S. Ct. at 2132 (quoting *Webster*, 486 U.S. at 603) (distinguishing two standards). The Court having concluded that this case does not meet *Thunder Basin*'s lesser standard, it follows *a fortiori* that it would not meet *Webster*'s heightened showing.

[24] The Court in *Elgin* did reiterate that "'competitive service employees, who *are* given review rights by Chapter 75, cannot expand these rights by resort to' judicial review outside of the CSRA scheme," 132 S. Ct. at 2133 (quoting *Fausto*, 484 U.S. at 450 n.3). Or, as the D.C. Circuit has more succinctly stated, "what you get under the CSRA is what you get." *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 2014 (D.C. Cir. 2009) (quoting *Fornaro*, 416 F.3d at 67); *see also Carducci v. Regan*, 714 F.2d 171, 174-75 (D.C. Cir. 1983). While the Court does not doubt that proposition as a general matter, the idea that Congressional silence in the CSRA as to a remedy might mean that Congress did not intend that remedy to exist in any forum, the analysis in *Elgin* makes clear that that canon of construction only runs so far as the competing presumptions of *Thunder Basin*, *Free Enterprise Fund*, and *Webster* permit it. In other words, the competing "presumption that Congress did not intend to limit district court jurisdiction" over constitutional claims where they would deprive a petitioner of all meaningful judicial review, assert claims collateral to the statutory scheme, and lie outside the agency's expertise, *Elgin*, 132 S. Ct. at 2136, can override the presumption of Congressional silence foreclosing review, and indeed do so in this case.

[25] Perhaps the best indication of the breadth of *Elgin* is Justice Alito's dissent. *See* 132 S. Ct. at 2143 (Alito, J., dissenting).

Court does not have jurisdiction to order OPM to recalculate any individual's payment post-*Lippman*, whether that individual has identified herself to OPM or not; that relief can only be sought through the CSRA. *See generally Fornaro*, 416 F.3d 63. As soon as an individual self-identifies, the CSRA provides her with adequate judicial review of her claim; and ordering OPM to calculate of its own accord annuities of individuals unaware of the right, while both laudable and logical, simply lies beyond this Court's authority in light of *Elgin* and *Fornaro*. But this Court does conclude that even after *Elgin*, it has jurisdiction, perhaps *because only a district court does*, to entertain a challenge to an undisclosed, systematic determination of OPM to fail to notify individuals of its own *Lippman* concession – individuals whom OPM unequivocally concedes are entitled to such enhanced benefits under the law – of their eligibility for such benefits.[26]   As the Court noted above, in that narrow field, the CSRA exclusivity and the sovereign immunity inquiries collapse; because the Court holds that the CSRA does not preclude

---

[26] *Fornaro*, 416 F.3d 63 is not to the contrary. Then-Judge Roberts observed that the question whether OPM had a "duty to notify annuitants about any enhanced benefits" was *not* before it, and that the "sole issue [was] whether mandamus is available to compel OPM to pay. . . ." *Id.* at 69. Although the Court cannot be certain that *Fornaro* would have found jurisdiction had the notice question been properly before it, it finds that observation telling, and a confirmation that at the least, the two potential duties present different analytical questions.

Nor are the cases that have considered various duties of OPM to notify annuitants to the contrary. First, the majority of the cases cited by OPM considered OPM's duty to notify *potential* annuitants (whose rights had not yet vested) of either *future* rights or rights to *file* for certain benefits. *See Davis v. OPM*, 918 F.2d 944, 946 (Fed. Cir. 1990) (right not yet vested); *Templeton v. OPM*, 951 F.2d 338 (Fed. Cir. 1991) (individual not yet retired); *Nordstrom v. United States*, 342 F.2d 55, 59 (Ct. Cl. 1965) (right not yet vested). By contrast, all the claims here have vested and belong to already retired employees. *Collins v. OPM*, 45 F.3d 1569, 1572 (Fed. Cir. 1995), stands only for the proposition that OPM does not have to notify an individual, *when he signs up* for an annuity involving an election of the type of benefit he will receive, of the consequences of a particular election.

It is true that statute does require OPM to provide notice to individual annuitants in certain other areas, *see* 5 U.S.C. §§ 8339(o)(2)(b)(6) (spousal election eligibility), suggesting that Congress knew how to require OPM notice when it wanted to. However, that cannot and does not alter the fact that notwithstanding Congress's silence in specifically providing for notice in the relatively rare situations of retroactive recalculations in light of agency acquiescence in a statute's applicability, as here, such notice might be constitutionally required, *see Mathews v. Eldridge*, 424 U.S. at 48-49; *Goldberg v. Kelly*, 397 U.S. 254 (1970), and therefore, that Congress would intend that that constitutional question be reviewed by some Article III court, *see Webster v. Doe*, 486 U.S. at 603; *see also Schroeder v. Hegstrom*, 590 F. Supp. 121, 128 (D. Or. 1984) ("Due process requires that [AFDC] recipients be given sufficient notice to permit them to determine whether they are receiving the support to which they are entitled") (collecting cases).

a district court action of the limited nature here, the APA's waiver of sovereign immunity in 5 U.S.C. § 702 is applicable here. *Cf. Fornaro*, 416 F.3d at 407.

## C. Jurisdiction; Causes of Action

Having determined that sovereign immunity does not bar the present claim, and that the CSRA does not of its own force divest this Court of jurisdiction it otherwise possesses, it is appropriate to highlight the source of this Court's jurisdiction as tied to a federal cause of action. First, in the absence of the CSRA exclusivity, 28 U.S.C. § 1331's grant of federal question jurisdiction remains in full force. *See Whitman v. Dep't of Transp.*, 547 U.S. 512, 513-14 (2006) ([§ 1331] grants jurisdiction . . . . The question, then, is not whether 5 U.S.C. § 7121 confers jurisdiction, but whether § 7121 (or the CSRA as a whole) removes the jurisdiction given to the federal courts . . . or otherwise precludes employees from pursuing remedies beyond those set out in the CSRA"); *see also McNary*, 498 U.S. at 494. It is apparent that in a case such as this, an action by federal employees against a federal agency asserting rights under the Federal Constitution in a property interest granted by federal statute, federal question jurisdiction is satisfied.

Finally, some consideration of the remaining causes of action is in order. A number of Plaintiffs' causes of action likely come with additional hurdles: for example, the mandamus statute requires a clear, nondelegable duty, *see Heckler,* 466 U.S. at 616; and a cause of action under the APA would require a "final agency action", among other requirements. OPM has strenuously argued in its briefing that some of those factors are not present here, and indeed moves to dismiss Plaintiff's mandamus count for failure to state a claim. *See* ECF No. 94 at 19, 22-23. While the question of whether Plaintiffs have properly stated a claim for relief is more appropriately answered under the rubric of Fed. R. Civ. P. 12(b)(6), if all of Plaintiffs' claims

were facially meritless, there would be no actual case over which this Court could exercise its jurisdiction. Therefore, the Court concludes that it has the obligation to assure itself that at least one facially viable claim remains on which Plaintiffs' case could be based.

Such a cause of action does remain, in the form of an invocation of this Court's inherent equitable power (if not duty when the issue is properly presented) to enjoin agency action that is unconstitutional. Courts in the past have been less than crystal clear in explaining the source of the power of a federal court to enjoin the unconstitutional action of a federal agency or official, but the Court of Appeals for the D.C. Circuit may have explained it most plainly:

> The courts' power to impose equitable remedies against agencies is broader than its power to impose legal remedies against individuals. *Bivens* [*v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971)] actions are a recent judicial creation and, as *Carlson v. Green* made clear, comparatively easy for Congress to preempt. The court's power to enjoin unconstitutional acts by the government, however, is inherent in the Constitution itself, *see Marbury v. Madison.*

*Hubbard v. E.P.A.*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) *on reh'g sub nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988). The Supreme Court also recently gathered cases in support of such a proposition.

> *See, e.g., Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"); *see also Ex parte Young*, 209 U.S. 123, 149, 165, 167 (1908).

*Free Enterprise Fund*, 130 S. Ct. at 3151 n.2; *see also Pierce v. Society of Sisters*, 268 U.S. 510, 536 (1925) ("Prevention of impending injury by unlawful action is a well-recognized function of courts of equity"). The D.C. Circuit has explained that such a cause of action might stand alongside a claim under the APA. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) ("Trudeau asserts that he has a direct cause of action under the First Amendment. We have

inferred such a cause before, and the FTC concedes that it is available to Trudeau."). Therefore, the Court concludes that it lies within its equity power to enjoin actions of OPM found to be unconstitutional, which can alternatively be viewed as a power invoked by a direct cause of action under the Constitution, a power that stands separate and apart from its authority to provide legal remedies under the APA or the mandamus statute.[27]

In addition, the Court notes that "nonstatutory review" may also be another rubric by which Plaintiffs' claims here could persist. Our Court of Appeals has recently approvingly referred to the availability of "nonstatutory review" of agency action. *Treasurer of N.J.*, 684 F.3d at 400 (citing *Trudeau*, 456 F.3d at 187). Under that doctrine, "'[e]ven where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction.' *Griffith v. FLRA*, 842 F.2d 487, 492 (D.C. Cir. 1988)." *Trudeau*, 456 F.3d at 189-90. While it is not appropriate for the Court to now rule on the merits of such a potential cause of action, and it does not do so here, it notes that it might well serve as an alternative basis for this Court's jurisdiction in this case outside the strictures of the APA or the mandamus

---

[27] In *Mitchum v. Hurt*, 73 F.3d 30 (3rd Cir.1995), *overruled on other grounds by Elgin*, 132 S. Ct. 2126, our Court of Appeals in an opinion authored by then-Judge, now Justice, Alito held that the limitations accompanying the *Bivens* remedy of monetary damages against federal officers did not apply to suits seeking to enjoin agency action, and reaffirmed that equitable power of the courts. While this Court has previously characterized *Mitchum* as permitting a *Bivens* action seeking equitable relief, stating, "[plaintiff's] *Bivens* claims are dismissed . . . only to the extent that he seeks money damages", *Yu v. U.S. Dep't Veterans Affairs*, CIV.A. 08-933, 2011 WL 2634095 (W.D. Pa. July 5, 2011), it appears that *Mitchum* never actually characterized the equitable relief as being brought *under Bivens*, instead speaking of "[t]he power of the federal courts to grant equitable relief for constitutional violations" more abstractly. *See* 73 F.3d at 35. The Court also notes that the Supreme Court in *Malesko*, 534 U.S. at 72, contrasted "the *Bivens* remedy" with "injunctive relief," seemingly disavowing the existence of something like a '*Bivens* action seeking injunctive relief.' While the Court is of the view that this cause of action derives from the inherent powers of the Court sitting in equity, and not under the auspices of the *Bivens* case, which remains limited to claims for monetary damages, regardless of the label applied, the existence of that judicial power as recognized in this Circuit remains plain.

statute.[28] *See Khodara Envtl., Inc. ex rel. Eagle Envtl., L.P. v. Burch*, 245 F. Supp. 2d 695, 711 (W.D. Pa. 2002) *rev'd and remanded on other grounds sub nom. Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187 (3d Cir. 2004) (collecting cases supporting nonstatutory review of agency action and injunctive relief outside the APA).[29] Again, the Court observes only that at a minimum, Plaintiffs have asserted colorable constitutional claims, claims which in the absence of exclusivity of the CSRA's remedial scheme, assert a cause of action in (or invoke the inherent equitable powers of) this Court in a manner sufficient to support the exercise of subject matter jurisdiction, even in the limited sphere described here.

### D. Justiciability

Although the Court has concluded that its federal question jurisdiction over the instant action has not been stripped entirely by the CSRA remedial process, it is continually obliged to satisfy itself of its subject matter jurisdiction more broadly, including assessing whether a "case" or "controversy" in accordance with Article III of the Constitution is presented. *See, e.g., Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008); *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76 (3d Cir. 2003).

Here, Plaintiffs initially filed a Complaint alleging that OPM maintained a policy of only recalculating an individual's benefits if she specifically requested it. *See* ECF No. 1. ¶¶ 44-50. During this litigation, OPM revealed that even if that was once its initial policy, at some point in 2011, it abandoned that policy and began to attempt to recalculate and notify eligible individuals,

---

[28] It is in light of this conclusion, that the Court does not need to examine the propriety of mandamus relief, as challenged by Defendant's Rule 12(b)(6) Motion, in order to determine whether there is any colorable cause of action that may support jurisdiction here, that the Court will permit Defendant to reassert its arguments that a claim for relief under mandamus has not been stated at later point in time, to be determined alongside the merits of Plaintiffs' other potential causes of action.

[29] The Declaratory Judgment statute, 28 U.S.C. § 2201, may also support a cause of action here. *See, e.g., Yu*, 2011 WL 2634095, at *15 ("The relevant inquiry is whether the requested relief will (1) clarify and settle legal relations in issue and (2) terminate and afford greater relief from the uncertainty, insecurity, and controversy giving rise to present action.") (internal quotation omitted.).

once it realized it was possible to do so. According to OPM, it had already identified the two groups of potentially eligible individuals, had begun to recalculate benefits for the List 1 individuals, and was preparing a mass mailing to the List 2 individuals. It further appears that it may be that the only thing preventing OPM from continuing to do those activities – the very activities Plaintiffs were suing OPM for its failure to do – was this Court's own orders, entered at the behest of Plaintiffs, forbidding OPM contact with any putative class member in this case. *See* ECF Nos. 75; 87; 119. Plaintiffs then filed their Amended Complaint, which, almost identically to the first, made a blanket allegation that OPM had a policy of recalculating an individual's benefit only if she specifically requested it, an assertion which may not have been in accord with factual reality. *See* ECF No. 81 ¶¶ 47-48, 71-72.

In light of these facts, the Court believes that a question of justiciability lies before it, especially now that the Court has narrowed the issue that it has the power to decide to only whether OPM is obligated to *notify* potential eligible annuitants. Plaintiffs seek, *inter alia*, a declaration that OPM is obligated to identify and notify potential eligible annuitants of its *Lippman* acquiescence (and the process for activating it), and an injunction ordering OPM to do so; OPM seemingly agrees that it is obligated to identify and notify potential eligible annuitants, and asserts that it was attempting to do so until Plaintiffs' Rule 23(d)(1) motion put the brakes on those efforts. Given the relative thinness of the facts of record relating to those efforts at this time, and the lack of briefing on the matter, it is difficult to pin down the exact category of the potential justiciability concern: whether the case is not yet ripe, because Plaintiffs are too early in challenging a failure to receive a remedy which they are about to receive anyway;[30] whether the case is moot, because at least since the initial filing of this action, intervening events have

---

[30] "Ripeness requires a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Lewis v. Alexander*, 685 F.3d 325, 341 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 933 (U.S. 2013) (internal quotation omitted).

removed a controversy between the parties;[31] or whether other rubrics such as a lack of APA "final agency action"[32] would more appropriately guide the inquiry. For example, one approach would be for the Court to simply lift the orders currently in place, ECF Nos. 75, 87, 119, and for the parties to wait and see whether the injury Plaintiffs fear (OPM neglecting its avowed duty to recalculate or notify) then actually materializes.[33]

Rather than immediately order further briefing in this already heavily briefed case, the Court believes the better course is to convene a status conference to assess, with the parties' participation, the best course to tack in this case going forward. Defendants' petition for dismissal for want of subject matter jurisdiction is now off the table, as is Plaintiffs' request for injunctive relief from this Court ordering OPM to recalculate benefits. For example, in *Anselmo*,

---

[31] *See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Additionally, whether the jurisprudence surrounding "voluntary cessation" is relevant to this case is another issue to be determined (and the applicability of that doctrine where there has been an amended complaint, for example).

[32] *See, e.g., Am. Disabled for Attendant Programs Today v. U.S. Dep't of Hous. & Urban Dev.*, CIV. A. 96-5881, 1998 WL 113802, at *2 n.6 (E.D. Pa. Mar. 12, 1998), *aff'd*, 170 F.3d 381 (3d Cir. 1999).

[33] Without ordering the lifting of that order here, it appears to the Court that its continuance may no longer be proper: it seems the best way for the Court to vindicate the rights of putative class members is to permit OPM to notify them. Far from attempting to "pick off" plaintiffs in an attempt to moot a case, *Weiss v. Regal Collections*, 385 F.3d 337, 345 (3d Cir. 2004), OPM would be left to attempt to give *every* putative class member the *entirety* of the relief that this Court may potentially ensure it gives. In that vein, the Court notes that a Rule 23 class action may or may not be the form this case should ultimately take, given the narrow scope of the relief this Court could afford to a narrow group of individuals.

The Court does observe, however, that its determination that it only has the jurisdiction to consider a challenge to OPM action as it relates to individuals who are unaware of their potential annuity entitlements, a group of individuals that may necessarily exclude each named Plaintiff in this action, may raise questions both of Rule 23(a) typicality and representativeness, and of Article III standing. As just explained, this litigation may not ultimately take the form of a class action at all, and therefore Rule 23's requirements need not be definitively considered now. With regard to one party asserting the claims of another, however, the Third Circuit has recently reasserted that "the prohibition on third party standing, however, 'is not invariable and our jurisprudence recognizes third-party circumstances,'" and that "'the principles animating prudential standing are not subverted if the third party is hindered from asserting its own rights and shares an identity of interests with the plaintiff.'" *In re Majestic Star Casino, LLC*, 12-3200, -- F.3d --, 2013 WL 2162781, at *7 (3d Cir. May 21, 2013) (quoting *Pa. Psychiatric Soc'y v. Green Spring Health Servs. Inc.*, 280 F.3d 278, 288-89 (3d. Cir. 2002)) (internal marks omitted). These circumstances appear to be met under the facts of this case: claims brought by a group of individuals who have suffered injury (failure to receive annuities), and share an identity of interests (retroactive recalculation of annuities under the Enhancement Act), with those who have an inherent obstacle from pursuing their own claims. Therefore, the Court does not consider the prudential limitation on third party standing to impede this litigation at this point.

the court monitored the voluntary actions of OPM to notify the eligible *Wassenaar* Plaintiffs, *see Anselmo v. King*, Civ. A. No. 94-0895, slip op. (D.D.C. Mar. 18, 1998), *available at* Pls.' Resp. Mot. Dismiss Ex. D, ECF No. 99-4, and in *Fornaro*, OPM had stipulated it would voluntarily notify the eligible *Pitsker* Plaintiffs, 416 F.3d at 63.

## IV. CONCLUSION

The CSRA does not divest this Court of subject matter jurisdiction over the instant action, but that jurisdiction exists only to the extent that Plaintiffs seek relief relating to the notification of individuals who are arguably entitled to, but otherwise unaware of, their eligibility for a post-*Lippman* recalculation in light of OPM's self-stated statutory obligation to recalculate, and therefore Defendant's Motion to Dismiss is denied in that regard. The litany of what remains to be determined includes (1) whether on the merits, Plaintiffs are entitled to the injunctive and declaratory relief they seek that lies within the narrow boundaries of this Court's jurisdiction; (2) whether in light of this ruling, it would be appropriate or permissible to certify a class under Fed. R. Civ. 23 at all, including as to only a "notification" class; and (3) whether this case continues to present an Article III case or controversy. The Court will convene a conference with the parties in the context of effecting a just, speedy, and inexpensive resolution of this case. Fed. R. Civ. P. 1.

An appropriate order will issue.

Mark R. Hornak
United States District Judge

Dated: June 7, 2013

cc:     All counsel of record

38