## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AUDREY L. GORGONZOLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:10-cv-01768 |
| v. | ) | |
| | ) | Chief Judge Mark R. Hornak |
| KIRAN AHUJA[1], DIRECTOR, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Over the past decade, litigation of this case has dragged on while the certified Class consisting of retired and aging Department of Veterans Affairs nurses, some of whom (including two of the originally named Plaintiffs) have died, waits for the enhanced retirement benefits Congress promised to them and to which all parties acknowledge they are legally entitled. Now pending before the Court are two Motions, the latest in a long line of contentious filings the parties have advanced in this case: (1) Plaintiffs' Motion for All Writs Injunction or Mandamus Relief (ECF No. 428); and (2) Defendant's Motion to Modify or Vacate the Court's Holdback Order (ECF No. 462.)

The issues central to these Motions are at the core of the sound administration of justice, and primarily concern the Court's authority to preserve its own jurisdiction and to enforce its own Orders.

---

[1] The Defendant in this case is the Director of the Office of Personnel Management ("OPM"), in her official capacity. Throughout the Opinion the Court will interchangeably refer to Defendant Director as "OPM," "Defendant," or by the pronouns "she" and "her." In doing so, the Court does not address Ms. Ahuja in her personal capacity.

Because the Court concludes that it has the power to enforce its own Orders, and because the Defendant has persistently and affirmatively impeded the fulfillment of those Orders, for the reasons and on the terms set out in this Opinion, Plaintiffs' Motion is GRANTED. The Defendant's Motion is DENIED in full.

## I.  **FACTUAL AND PROCEDURAL HISTORY**

The Court and the parties are intimately familiar with the twists and turns of this case. The parties should be particularly so, since they have plowed the same ground time and again in this case, as has been recited in four substantive Opinions from this Court (*Gorgonzola v. McGettigan*, No. 2:10-cv-01768, 2017 WL 11477213 (W.D. Pa. Aug. 23, 2017) ("*Gorgonzola II*"); *Gorgonzola v. McGettigan*, No. 2:10-cv-01768, 2017 WL 1449789 (W.D. Pa. Apr. 21, 2017) ("*Gorgonzola I*"); *Wigton v. Kaplan*, No. 2:10-cv-01768, 2014 WL 4272791 (W.D. Pa. Aug. 29, 2014) ("*Wigton II*"); *Wigton v. Berry*, No. 2:10-cv-01768, 949 F. Supp. 2d 616 (W.D. Pa. 2013) ("*Wigton I*")), and one from our Court of Appeals (*Gorgonzola v. Dir. United States Off. of Pers. Mgmt.*, 782 F. App'x 207 (3d Cir. 2019)). Nonetheless, for their part, the parties present somewhat competing narratives about the history of this case, including who or what triggered the various events encountered throughout this drawn-out litigation.[2] Given the extensive litigation and multiple prior Opinions and Orders in this case, the Court will recite here only the factual and procedural history that is necessary and relevant to addressing the pending Motions.

---

[2] This litigation has involved issues that are at times complicated and substantial. It is also the case that the Court has accommodated the parties' unopposed or consented-to requests for extensions of filing deadlines and continuations of hearings. Most times, those were joint requests premised on the representations of counsel that they were engaged in one or more forms of "meet and discuss" processes aimed at obviating the need for judicial action. And in the Court's experience, they were often but not always accurate in such assessments. The balance of such requests were often premised on requests from counsel for both parties that they were overburdened with briefing and other obligations in other cases. The Court granted each of those requests.

A.    **A Recap of the Court's Prior Opinions**

Through this lawsuit, Plaintiffs – all retired Veterans Affairs ("VA") nurses or the personal representatives of deceased nurses – seek to have the Office of Personnel Management ("OPM") provide them with "enhanced" retirement annuity benefits, based on Congress's passage of a law called the "Enhancement Act," which directed the very benefits enhancement the Plaintiffs seek. *See Wigton I*, 949 F. Supp. 2d at 618–23 (discussing in detail the factual history that led to the filing of the lawsuit in this case). A few of the Court's prior decisions are especially pertinent here; they make up the "ground rules," so to speak, that drive the currently pending Motions and the Court's consideration of them.

First, back in 2011, the Court, at Plaintiffs' request, issued a Rule 23(d) Order that prohibited OPM from directly contacting lead Plaintiffs or Class members without notice to Plaintiffs' counsel. (ECF No. 75; *see also* ECF Nos. 87, 119.)

Second, in June 2013, the Court held that it lacks original jurisdiction to order OPM on the merits to recalculate Class members' retirement annuities, as "that relief can only be sought through the [Civil Service Reform Act ("CSRA")]." (ECF No. 128, at 31; ECF No. 129.) But the Court determined that it had subject matter jurisdiction to a limited but important extent: to entertain a challenge to OPM's failure to notify individuals of their eligibility for the annuity recalculation that would lead to enhanced retirement benefits. (ECF Nos. 128, 129.) *See also Wigton I*, 949 F. Supp. 2d 616.

Third, fast-forward to April 2017. At that time, the Court ordered identification and notice relief to the Class. ("Notice Opinion," ECF No. 277; "Notice Order," ECF No. 278.) *See also Gorgonzola I*, 2017 WL 1449789. The Court concluded that OPM must notify the Class about this

litigation, which was focused on the recalculation and increased annuities for Class Members.[3]
(ECF No. 277; ECF No. 278.) The Court's Notice Order required counsel for both parties to file a
Joint Status Report ("JSR") detailing the procedure for identifying and giving class and remedial
notice to Class members and to append an agreed-upon form of notice to the JSR. (ECF No. 278,
at 3.) Because OPM had told the Court that it was (and long had been) ready to, obligated to, and
desirous of performing the recalculation of annuity benefits and then paying the recalculated and
"enhanced" annuity benefits but also believed that the existence of the Rule 23(d) Order was
standing in the way of OPM doing that, the Court stated that once the Court approved the form,
content, and timing of such notices, the Court's prior Rule 23(d) Order would be deemed modified
so as to permit OPM to directly contact Class members through such notice "and otherwise
thereafter in the facilitation of the annuity recalculation process." (*Id.*) The Court also approved a
one-time holdback of a portion of any retroactive annuity payments for a possible future attorney
fee award. (ECF Nos. 277, 278.) The Court did not, on the merits, order the recalculation of any
benefits by OPM.[4]

Notably, in the Court's April 2017 Opinion the Court also observed that OPM had sought
to backtrack on its many prior formal acknowledgements that the recalculation and payment of

---

[3] That Opinion described the notice to be provided at that stage of the case as follows: "Given the twists and turns of OPM's positions as to its admitted legal obligation, and the effect that has had on this litigation, this Court concludes that the rights of class members to know of and effectively participate in this litigation are best protected by giving them notice of it. . . . The Court concludes that notice here is in the interests of justice and will therefore order the parties to prepare a notice form consistent with this Opinion and to file a timely joint status report on the docket in this case detailing the steps taken to identify the class members and give them notice." (ECF No. 277, at 23.)

[4] But as is set out below, OPM told the Court in the proposed Notices that it concurred in, and otherwise, that it would nonetheless be doing those very recalculations, (ECF No. 465, at 8 (referencing ECF No. 140)), and in its pending Motion OPM again makes just such a recalculation commitment, but only so long as this Court were to first vacate its Holdback Order. (ECF No. 465, at 4, 10). To this day, OPM has not demonstrated that its authority to make any recalculations, especially ones that would be forward looking, is in any way impaired or limited by the existence of the Holdback Order or the existence of this lawsuit. And an examination of that Holdback Order reveals no such impairment on OPM's authority. Thus, it appears to the Court that OPM's stated position imposes a precondition to recalculation and payment of enhanced benefits that is of OPM's own creation.

enhanced annuity benefits was required by law and were actions that it was desirous of taking, and that its efforts to recant those concessions were so plainly unsupported by the record and contrary to its own statements so as to generate the application of the doctrine of judicial estoppel against the Defendant as to such matters. *See Gorgonzola I*, 2017 WL 1449789, at *4, n. 4.

Fourth, later that year, after considering briefing on the issue, the Court concluded that a one-time 30% holdback from the anticipated lump sum retroactive payment of "enhanced" annuity benefits to each annuitant (or their authorized representative) for the payment of potential attorney fees was appropriate. ("Holdback Order," ECF No. 318.) *See also Gorgonzola II*, 2017 WL 11477213. The Court noted that the 30% holdback *amount* was subject to reexamination "at any time upon the Court's own motion, or upon the motion of any party for cause shown." (ECF No. 318, at 6.) In particular, the Court emphasized that the holdback amount could be adjusted if the cumulative total of the amount held back grew to a degree that it began to represent a sum at odds with a reasonably likely range of attorney fees to be awarded. (*Id.*) Notably, the Holdback Order is not and was not applicable to any future annuity payments. It only impacted the one-time retroactive "catchup" payment to a given annuitant.

### B.    The Proposed Notices

Following the Notice Opinion and Order, the parties jointly submitted to the Court various proposed Notices tailored for specific groups of recipients that Defendant intended to send to Class members upon the Court's approval. (*See, e.g.*, ECF Nos. 311, 313, 335, 361, 393, 397, 424.) The contents of the Notices varied somewhat because the different "Lists" of potential annuitants required different forms of notice. But there were common elements that ran through all of the Notices.

1. <u>The Court's Involvement</u>

First, the proposed Notices each affirmatively stated that they were issued at the direction of a federal court. This Court, in fact. In bolded font at the top of the proposed Notices were these words: "**The U.S. District Court for the Western District of Pennsylvania authorized this notice.**" (*See, e.g.*, ECF No. 311-1, at 2.) The Notices further provided that they were sent "in accordance with a 2017 Court ORDER issued by U.S. District Court Judge Mark Hornak of the Western District of Pennsylvania." (*See id.*)

2. <u>The Next Steps</u>

Second, the Notices explained, *i.e.* provided "notice" of, the process of receiving any enhanced benefits. They informed the recipients that OPM "will" act to recalculate annuities and pay the recalculated benefits. For example, the Notice for the List 1 Class members stated: "OPM will review your retirement file to confirm if you are eligible for a recalculation. **If you are eligible, OPM will recalculate your annuity and send you an agency decision. You do not have to ask OPM to do so.**" (*Id.*) The Notice reiterated this affirmation in a section entitled "What Happens Next," in which it explained that OPM will review case files to determine whether a person is eligible for a recalculation. The Notice stated: "If you are found eligible, OPM will recalculate your annuity. **You will not have to make a specific request for recalculation. <u>OPM will send you a written decision, which will tell you whether you are entitled to an increase.</u>**" (*Id.*) The List 1 Notice also stated that if a recalculation showed entitlement to an increased annuity, Defendant would send past-due benefits and increase monthly annuities going forward. (*Id.* at 4.)

As stated, not all of the proposed Notices were exactly the same. Unlike the Notice for List 1 Class members, the Notices for the Class members under the other Lists specified that annuitants needed first to submit specified forms to Defendant before Defendant would review files related

6

to, or send any enhanced benefits to, annuitants. (*See, e.g.*, ECF No. 361-1, at 2.) But the Notices said that once the annuitants submitted such forms, Defendant would automatically review the files, issue decisions, recalculate annuity payments for those eligible, and pay recalculated benefits. Every form of Notice stated that if recalculation showed that the person was entitled to an enhanced benefit, Defendant "will send" the proper payment. And most notably for these purposes, the proposed Notices were generated from a filing with this Court made with the joint concurrence of both parties.

        3.   <u>The Holdback Order</u>

Third, all Notices indicated that a portion of any retroactive benefits owed and paid will be held back for a possible attorney fee award. The List 1 Notice was submitted and approved before the Court's Holdback Order specified that 30% was an appropriate amount to be held back from any lump sum payment of retroactive enhancements to annuity benefits. As to the holdback, the List 1 Notice stated that Defendant will "set aside a percentage of past due benefits for a possible attorney fee award." (ECF No. 311-1, at 4.) But all other Notices were issued after the Holdback Order was entered and specified that the amount held back would be 30%. For example, the List 3 Notice stated that Defendant will send past due benefits retroactive to the retirement date and "will set aside 30% of the additional payment for a possible attorney fee award." (ECF No. 335-2, at 4.)

These portions of the Notices do not provide any qualifications to Defendant's stated plans to recalculate benefits and pay enhancements, nor do they suggest any objections by Defendant to the Holdback Order.[5]

## C.     **The Joint Status Reports**

Alongside the proposed Notices, the parties submitted Joint Status Reports ("JSRs") outlining the procedures to identify and notify individuals in the respective Lists. The JSRs clarified that the parties together agreed upon the procedures and forms to identify and provide the notice directed by the Court to the Lists of Class members. In footnotes in the JSRs, Defendant noted that by submitting the JSRs to the Court, she was not conceding that the Court had jurisdiction over the subject matter of the action, nor was she waiving her right to appeal prior rulings of the Court. (*See, e.g.*, ECF No. 313, at 1 n.1; ECF No. 335, at 2 n.1.) Nonetheless, there was no statement by the Defendant in any JSR that such reservations would slow down or in any way hinder the dispatch of the Notices or the recalculation and payment activities the Notices recited.

In various JSRs, the parties also discussed outstanding disagreements. For example, the Notices affirmed that Defendant would issue decisions to those persons on certain Lists of Class

---

[5] In fact, it appears that the reference to the Holdback Order was included in at least one of the Notices because of *Defendant's* insistence on such reference being included. The Joint Status Report submitted alongside the List 4 Notice includes the following footnote:

> The attached proposed List 4 notice includes a reference to the Holdback Order only because OPM has insisted on including that information in the List 4 notice because it believes that this notice should include the same language referencing the Holdback Order as was included in the previously approved notices sent to Lists 1-3, 3A and 3B. Plaintiffs proposed and were willing to agree to an alternative notice form for submission to the Court that did not reference the Holdback Order. OPM does not understand why Plaintiffs have proposed deleting this language, as the Holdback Order this Court entered remains in effect, and individuals receiving this notice should be fully informed (consistent with the agreed-upon, Court-approved notices previously transmitted to all other notice recipients) that any recalculations will be subject to this Order.

(ECF No. 424, at 2 n.3.)

members to notify them of the results of OPM's file review and, if they are eligible, recalculation. The accompanying JSRs specified that those items were not included in the Notice procedures within the JSRs because "the parties disagree whether such decisions are relevant to notice." (*See, e.g.*, ECF No. 311, at 2 n.3; ECF No. 361, at 2–3 n.4.)

### D.   <u>The Notice Orders</u>

In all instances, the Court reviewed and approved the party-submitted form of the Notices with only minor modifications and ordered that the Notices be transmitted to the respective annuitants. ("Notice Orders," ECF Nos. 317, 349, 362, 395, 398, 433.) And in the case of each of those Notices, the Court's approval of them was in the form of an Order directing Defendant to transmit the Notices to recipients.

Critically to the issues involved here, between August 2017 and December 2019, the Court issued a series of Orders approving "the plan[s] of notice *and procedures* agreed to by the parties" as reflected in the JSRs and proposed Notices. (*See* ECF Nos. 362, 395, 398, 433; *see also* ECF No. 317 (approving "the form[] of notice for List 1" and ordering transmittal of the List 1 Notices "on the terms advanced by the parties" in the JSR); *see also* ECF No. 349 (emphasis added).) And as mentioned above, all but one of the JSRs and proposed Notices were submitted to and approved by the Court *after* the Court issued its Holdback Order. As for the pre-Holdback Order JSR and Notice, the Court stated in the related Notice Order that it would address the "question of the amount of any 'holdback' from any lump-sum catch-up payments by separate Order." (ECF No. 317.)

The Notices were submitted to and approved by the Court as follows:

| List | Proposed Notices | Notice Order |
|---|---|---|
| List 1 | Jointly submitted on August 1, 2017 (ECF No. 311-1) | Approved by Court Order on August 21, 2017 (ECF No. 317) |
| | *Holdback Order issued on August 23, 2017* | |

| List 3 | Jointly submitted on November 1, 2017 (ECF No. 335-2)[6] | Approved by Court Order on January 5, 2018 (ECF No. 349) |
|--------|----------------------------------------------------------|----------------------------------------------------------|
| List 2 | Jointly submitted of February 15, 2018 (ECF No. 361-1) | Approved by Court Order on February 16, 2018 (ECF No. 362) |
| List 3B | Jointly submitted on June 25, 2018 (ECF No. 393-1) | Approved by Court Order on June 28, 2018 (ECF No. 395) |
| List 3A | Jointly submitted on July 23, 2018 (ECF No. 397-1)[7] | Approved by Court Order on July 24, 2018 (ECF No. 398) |
| List 4 | Jointly submitted on September 24, 2019 (ECF No. 424-1)[8] | Approved by Court Order on December 19, 2019 (ECF No. 433) |

### E.     **Defendant's Appeals**

Defendant appealed multiple of the Court's prior Orders and Opinions. In October 2017, Defendant appealed various decisions, including the Notice Opinion and Order (ECF Nos. 277, 278), the Holdback Order (ECF No. 318), and the List 1 Notice Order (ECF No. 317.) (*See* ECF No. 329.) In April 2018, Defendant filed another notice of appeal, including this time an appeal of the Court's List 2 Notice Order. (*See* ECF No. 370.) The Third Circuit consolidated the appeals. (*See* ECF No. 375, at 2.)

Upon Defendant's filing of the second notice of appeal (ECF No. 370), this Court directed counsel to inform the Court as to the impact, if any, of the appeals on the further litigation in this Court and the notice process that the Court authorized. (ECF No. 371.) Importantly, Defendant in response to that directive of this Court informed the Court that she had not sought a stay of the Notice Orders and *did not intend to seek a stay of such Orders*. (ECF No. 375.) Just as important, Defendant also represented that the filing of that more recent appeal would not impact the Notice processes that the Court had directed by formal Orders. (*See id.*)

---

[6] List 3 was originally submitted at ECF No. 311-2 on August 1, 2017; a revised List 3 was submitted at ECF No. 335-2 on November 1, 2017. (*See also* ECF No. 326.)

[7] List 3A was originally submitted at ECF No. 313-1 on August 10, 2017; a revised List 3A was submitted at ECF No. 397 on July 23, 2018.

[8] Separate reports on procedures for identification and notice to List 4 were originally submitted at ECF No. 361-2 and ECF No. 361-3 on February 15, 2018; a revised List 4 was submitted at ECF No. 424 on September 24, 2019.

In June 2018, counsel for Plaintiffs asked counsel for Defendant when OPM intended to recalculate annuities and process benefit payments for eligible Class members. (*See* ECF No. 429-1.) On July 6, 2018, counsel for Defendant responded that OPM was appealing this Court's orders to the Third Circuit and that it did not intend to re-finalize calculations or make payments at that time. (ECF No. 429-2.) But counsel for Defendant also stated that OPM was sending out Notices, reviewing files for eligibility, and performing preliminary recalculations so that it could be "in a good position to pay recalculated annuities and benefits following resolution of the appeal." (*Id.* at 2.)[9]

On appeal, Defendant asked the Third Circuit to vacate the Court's various Notice Orders and Holdback Order. On August 5, 2019, the Third Circuit concluded that the appeals of the Notice Orders were moot because Defendant admitted that she had transmitted the Notices, as ordered by this Court. *See Gorgonzola v. Dir. United States Off. of Pers. Mgmt.*, 782 F. App'x 207, 212 (3d Cir. 2019). The Third Circuit also dismissed Defendant's appeal of the Holdback Order because it concluded it lacked appellate jurisdiction to consider it at that time. *Id.* at 213-14.

---

[9] As will be seen below, when that appeal was not resolved in the Defendant's favor, the Defendant stopped in her tracks and has not taken the steps or "procedures" set out in the Notices which were directed by the Orders of this Court and which Defendant represented to the Court were not affected by the pending appeals.

Regrettably, one inference from this is that the Defendant believed that she would prevail in her appeal relative to the Holdback Order, and her subsequent inaction has its genesis in her disappointment with the outcome on her appeal. Further, given that in resolving the Defendant's appeal our Court of Appeals concluded that it did not have appellate jurisdiction to consider the Holdback Order on the merits as there was not a final appealable order in such regards, an additional fair inference is that the Defendant has acted as she now has, *e.g.* by stopping the "procedures" she said she was doing and would be doing in the Court-approved Notices in an effort to generate an Order of this Court that she could appeal anew.

It would indeed be unfortunate if OPM has acted contrary to this Court's Orders and the Notices sent to annuitants, and in doing so failed to pay the enhanced annuity benefits Congress directed by legislation be paid, and which OPM has conceded should be paid and said in the Notices would be paid, in order to generate the procedural posture OPM believes is necessary for another appeal.

F.      **The Aftermath of the Appeals**

According to Defendant, OPM transmitted Notices to the final list of Class members on or about March 17, 2020. (ECF No. 465, at 9; ECF No. 483, at 1.) Overall, Defendant sent out approximately 13,586 Notices. (ECF No. 483, at 1–2.) But it is undisputed by the parties that the substance relayed to the annuitants in the Notices—the promised recalculation and subsequent payment of increased benefits to those eligible, among other things—has yet to occur. None of it. Not as to, or to, one single eligible retired VA nurse. (ECF No. 429-3.)

One would reasonably ask, "Why not?" since Defendant has repeatedly said for years that she wants to do that, and every Notice that she sent to every retiree or beneficiary on every "List" said such would happen. And while, as noted above, she affirmatively stated to this Court that she would cause the recalculations to continue apace while her appeal was pending so that she would be in a "good position" to pay the recalculated benefits "following the resolution of the appeal," even after that appeal was resolved, Defendant has yet to do what the Notices gave notice of, namely that Defendant would recalculate benefits and then pay the required enhanced benefits.

Notably, Defendant has never said to the Plaintiffs or to the Court that the actions set out in the Notices (the "procedures" approved by this Court's Orders as recited above) would occur only if she prevailed in her appeal, but that certainly now appears to have been an underlying *sub silento* assumption behind her actions. And in her Motion now before the Court, she asks that the Holdback Order be vacated or modified so as to permit "[OPM] to issue full recalculated retroactive annuity payments to eligible Class Members, free of any holdback". (ECF No. 465, at 10.) Most critically, OPM does not cite to any legal authority for the proposition that the Holdback Order in any way limits or impairs its ability to make forward-looking recalculations or recalculated payments to any annuitant or survivor, but it has nonetheless now said that it will not

12

make any enhanced annuity payments (even forward-looking ones) that may be owed until any entitlement to attorney's fees and the amount of them were "completely resolved by a *final* order of the Court." (ECF No. 441, at 14) (emphasis added).[10]

### G. **The Pending Motions**

This brings us to the pending Motions. Consistent with the contentious history of litigation in this case, the briefing on these Motions is abundant.

On December 12, 2019, Plaintiffs filed a Motion for All Writs Injunction or Mandamus Relief, in which they asked the Court to order Defendant to comply with the commitments she made in the jointly submitted, Court-approved, and transmitted Notices sent to Class members. (ECF Nos. 428, 428-1.) Plaintiffs acknowledge that the Court previously concluded it lacks original jurisdiction to order Defendant to recalculate Class annuities, but they submit in their Motion that the new circumstances are "radically and fundamentally different" from the facts and record that existed previously. (ECF No. 428, at 2.)

Their point is that if the relief sought were granted, the Court would not be ordering the recalculation and payment of benefits *de novo*, but would be enforcing its own Orders, and more specifically, enforcing the commitments Defendant made to those receiving the Notices in the name of the Court that such recalculation of payments would happen, a course of action committed to by Defendant without qualification.

In response to Plaintiffs' Motion, Defendant admitted that this was indeed the state of affairs, and that it was no accident or oversight. The fact of the matter is that since the Notices

---

[10] The Defendant does not explain the connection she makes between (a) paying retired nurses the recalculated annuities that the law and OPM say they are entitled to, particularly the prospective enhanced payments not subject to the Holdback Order, and (b) the issue of attorneys' fees that causes her actions (or more properly, intentional inaction) to be dependent on the *final* resolution of any claim for attorneys' fees that might in the future be filed by Plaintiffs' counsel. No such connection (at least none that is based on the law) is apparent to the Court.

were approved by the Orders of this Court and were then transmitted to tens of thousands of annuitants or their representatives pursuant to those Orders, each succeeding Senate-confirmed or Acting OPM Director has failed to pay eligible Class members the recalculated retroactive annuity payments (and any enhancement to ongoing periodic payments) OPM said that it would, all because of the existence of the Holdback Order. (*See* ECF No. 441, at 5.) But as described below, Defendant nonetheless also contends that she in fact actually had fully complied with the Court's Orders simply by her transmitting the approved forms of the Notices to Class members. (*Id.* at 11.)

Defendant has thus asserted that the Court lacks subject matter jurisdiction to grant Plaintiffs' current Motion, given that the Court previously held its jurisdiction is limited to the power to order notice. And she then further argues that even if the Court were to find it has jurisdiction to direct the Defendant to do anything more (such as comply with the Orders of this Court), Plaintiffs have failed to satisfy the requirements for an All Writs Act injunction or mandamus relief.

Plaintiffs filed a Reply, emphasizing in part that the issue of a holdback has already been fully litigated in this Court. (*See* ECF No. 448.)

After Plaintiffs' Motion was fully briefed, the Court set oral argument. (*See* ECF No. 452.) Ten days before the scheduled argument, Defendant moved to continue the argument in part because, although more than three years had passed since the Court had entered the Holdback Order, she intended to file a Motion to Vacate or Modify that Holdback Order. (ECF No. 453.) Following a telephonic status conference, the Court rescheduled the oral argument. (ECF No. 460.)

In the meantime, Defendant then moved to vacate or modify the three-year-old Holdback Order. (ECF No. 462.) In that Motion, Defendant claimed that OPM's issuance of any payment

subject to a 30% holdback would violate statutory anti-assignment provisions[11] that govern the Civil Service Retirement and Disability Trust Fund, the source of the annuity payments. Defendant claimed that the Holdback Order thus put her in "an untenable legal dilemma." (ECF No. 465, at 2.) Defendant's Motion also pitched to the Court and Plaintiffs the existence of an undefined alternative safeguard for payment of future attorney fees as a substitute for the Holdback Order. (*See id.* at 14–16.) Plaintiffs responded to Defendant's Motion, and Defendant replied. (ECF Nos. 475, 478.)

The Court then held oral argument over the course of two days. (*See* ECF Nos. 468, 472.) During the argument, counsel for Defendant represented again that OPM might have a viable alternative to the Holdback Order that would satisfy counsel for Plaintiffs and the Court, and that such alternative would facilitate a simple resolution of the pending Motions. Minimal details were provided.

At the end of the oral argument, in yet another effort by the Court to bring these matters to the swifter conclusion that a consensual resolution would generate, the Court ordered the parties to meet and confer regarding this potential OPM proposal and to file a JSR as to those matters. (ECF No. 473.) The parties then filed such a report. (ECF No. 483.) In it, the parties explained that they had not reached an agreement, despite conferring multiple times. (*Id.*) And because the parties could not agree on the JSR's content, each party offered a separate section outlining their position on the issues raised at the oral argument and asked the Court to consider the sections in connection with the pending Motions. (*Id.* at 1 n.2.) This meant that counter to Defendant's representations

---

[11] These provisions are 5 U.S.C. §§ 8346(a) and 8470(a). Defendant calls these provisions anti-assignment provisions (*see* ECF No. 465, at 2); Plaintiffs refer to them together as the Anti-Alienation provision (*see* ECF No. 475, at 3.) Solely because Defendant is the moving party in relation to the arguments involving these provisions, the Court will refer to them as the anti-assignment provisions.

that some form of an agreement likely could be reached, the parties instead submitted additional briefing on the pending Motions, conveying only enhanced divisiveness.

But the briefing and submissions to the Court were not yet done. Defendant also filed a proposed order setting forth her proffered alternative to the Holdback Order. (*See* ECF No. 484.) Plaintiffs opposed the proposed order, reiterating some of their previous objections to Defendant's Motion and explaining what they saw as additional inadequacies with Defendant's proposal. (ECF No. 485.)

## II.    DISCUSSION

The Court will deny Defendant's Motion and grant Plaintiffs' Motion. The Court will first address Defendant's Motion.

### A.    Defendant's Motion

Defendant submits that she faces a Hobson's Choice: OPM can either issue full retroactive payments to eligible Class members and fail to hold back a specified amount for attorney's fees at the risk of violating the Court's Holdback Order, or she can issue partial initial "catch up" payments pursuant to the Holdback Order at the risk of violating what she posits are anti-assignment provisions under what she says is applicable federal law. But Defendant has already had—and has already taken—the opportunity to tell the Court why it should not hold back any funds for potential attorney fees. And the Court previously addressed this issue in not one, but two decisions. (ECF Nos. 277, 318; *see Gorgonzola v. McGettigan*, No. 2:10-cv-01768, 2017 WL 11477213 (W.D. Pa. Aug. 23, 2017); *Gorgonzola v. McGettigan*, No. 2:10-cv-01768, 2017 WL 1449789, at *14 (W.D. Pa. Apr. 21, 2017).) Defendant does not make a compelling argument for why the Court should reconsider its past decisions, and the Court will not do so. Here's why.

The parties previously submitted briefing in 2015 about whether the Court could and should hold back any funds from any lump-sum retroactive annuity payments for a possible attorney fee award. (*See* ECF Nos. 206, 219, 236.) In that round of briefing, Defendant opposed any holdback of funds, but never mentioned the anti-assignment provisions she so stalwartly points to now. (*See* ECF No. 219, at 8–14.) Instead, Defendant asserted that the Court lacked jurisdiction over the funds Plaintiffs sought to have held back and that sovereign immunity bars a holdback. (*See id.*)

After the Court rejected Defendant's arguments and held that a holdback was appropriate under the law, the Court ordered the parties to brief the specific amount of funds that should be held back. (*See* ECF Nos. 277, 278.) Plaintiffs asked for a 30% holdback from one-time retroactive annuity payments. (ECF No. 287.) It was then for the first time, in opposing Plaintiffs' request for a specific 30% holdback, that Defendant vaguely raised the potential issue of the statutory anti-assignment provisions she cites now. In an oblique footnote, Defendant contended that a holdback "would likely" violate the statutory prohibition against judicial assignment of federal retirement annuities under the CSRA, *see* 5 U.S.C. §§ 8346(a), 8470(a). (ECF No. 295, at 3 n.1.) Plaintiffs objected to Defendant's contention as untimely and meritless. (ECF No. 308, at 9–11.)

As discussed, the Court ultimately ordered that 30% of the retroactive lump-sum payments be held back. (ECF No. 318.) But the Court recognized and addressed OPM's sustained assertion that "there can/should be no holdback at all under the applicable law." (*Id.* at 1–2.) Though the Court did not expressly address the specifics of Defendant's anti-assignment provision argument, the Court stated in the Holdback Order:

> The Court has by its most recent prior Opinion and Order addressed the permissibility and appropriateness of any such holdback from the lump-sum "catch up" payments that may be paid to eligible annuitants/beneficiaries in these circumstances, and has considered the matters advanced by the parties in their

currently pending papers as to the question of whether any holdback is permitted and appropriate in this case. Concluding that the Court's prior Opinion and Order were correct legally and factually in such regards, and were by no means "manifestly unjust" to any party or other person, the Court will not revisit the substance of that decision at this time.

(*Id.* at 1.)

Defendant's current Motion relies on the very same anti-assignment provision argument that Defendant made in an 11-line footnote in a response brief more than four years ago. Plaintiffs' response to Defendant's Motion mirrors their earlier arguments: such an argument is untimely and waived (and is meritless in any event).[12] Plaintiffs characterize Defendant's Motion as a *second* Motion for Reconsideration that should be denied. (ECF No. 475, at 5–7.) They urge the Court not to disturb its prior rulings.

Plaintiffs' arguments are well taken. Now before the Court is Defendant's third bite at the holdback apple. At bottom, Defendant's Motion seeks to relitigate issues already presented to and decided by this Court. Twice. Indeed, in a footnote, Defendant acknowledges that the Court may consider its request as a motion for reconsideration. (ECF No. 465, at 11 n.5.)[13]

Generally, because of the interest in finality and judicial economy, motions for reconsideration should be "sparingly" granted. *Cole's Wexford Hotel, Inc. v. UPMC & Highmark*

---

[12] On the merits, Plaintiffs argue that the anti-assignment provisions that Defendant cite do not prohibit a holdback as a matter of law. (ECF No. 475, at 7–9.) Moreover, they point out that Defendant has long argued that she simply would not recalculate and make enhanced annuity payments if any conditions were attached to her ability to do so; Defendant surely took that position years before she even mentioned the anti-assignment provisions. (*Id.* at 10–11.) Plaintiffs also oppose Defendant's proposed alternative, which they contend is unfeasible. (*Id.* at 12–16.). From the Court's perspective, the tenor of the Plaintiffs' argument is that for more than a decade, the Defendant has thrown up a series of ever-changing justifications for her refusal to recalculate and pay enhanced annuity benefits, and this is just the latest in that long line of Defendant-generated obstacles.

[13] It seems to the Court that under Defendant's position, any party disappointed with a decision from the Court could simply file a "Motion to Vacate" the decision with which they disagree (at least so long as it is an interlocutory order), and the Court would have to decide the issues all over again as if it were considering a new motion from scratch. That shouldn't be, absent some showing of legal error in the initial order, since otherwise no litigant can confidently proceed based on a court's decision. The Court also notes that though the Motion is styled as a Motion to *Modify or* Vacate the Holdback Order, as far as the Court can tell, Defendant does not appear to request any relief other than vacating the Holdback Order. The only "modification" sought is the complete vacation of that Order.

*Inc.*, No. 10-1609, 2017 WL 432947, at *1 (W.D. Pa. Feb. 1, 2017). "A motion for reconsideration is not to be used to relitigate, or 'rehash,' issues the court already decided, or to ask a district court to rethink a decision it, rightly or wrongly, already made." *Id.* at *2 (citing, among other cases, *Williams v. City of Pittsburgh*, 32 F. Supp. 2d 236, 238 (W.D. Pa. 1998)). Furthermore, "[a] motion for reconsideration is not to be used as a way to advance additional arguments that the litigant could have made, but chose not to make, sooner, or as an opportunity for a litigant, having lost, to change theories of the case . . . ." *Id.* (citing, among other cases, *Bell v. City of Phila.*, 275 Fed. App'x 157, 160 (3d Cir. 2008)).

Ordinarily, the Court reviews motions for reconsideration under the *Max's Seafood* standard. Under that standard, "a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).[14]

But it is also true that district courts hold "inherent power to reconsider prior interlocutory orders." *State Nat'l Ins. Co. v. Cty of Camden*, 824 F.3d 399, 406 (3d Cir. 2016). And a court may permit reconsideration of interlocutory orders whenever "consonant with justice [to] do so." *See id.* at 406 n.14 (citation omitted); *see also In re Energy Future Holdings Corp.*, 904 F.3d 298, 310 (3d Cir. 2018) ("We have, on occasion, stated that lower courts 'possess[] inherent power over interlocutory orders, and can reconsider them when it is consonant with justice do so.'" (citing *id.* at 417)). Nonetheless, "[b]efore entertaining a motion for reconsideration of

---

[14] Without elaboration, Defendant contends that her Motion meets the *Max's Seafood* reconsideration standard because the requested relief would permit the Court to resolve a clear error of law and prevent a manifest injustice. (ECF No. 465, at 11 n.5 (citing *Max's Seafood Cafe*, 176 F.3d at 677).)

an interlocutory order, the movant must still establish good cause for why the court should revisit its prior decision." *Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 295 (M.D. Pa. 2016) (explaining that the reconsideration standard of interlocutory orders is "not entirely cohesive" within district courts in the Third Circuit). And "whether involving a final or interlocutory order, a motion for reconsideration is 'not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant.'" *Id.* (citation omitted); *see also Martin v. Wetzel*, No. 18-00215, 2021 WL 1536103, at *1 (W.D. Pa. Apr. 19, 2021) (citation omitted) (explaining that a motion for reconsideration of an interlocutory order is not a means to get a "second bite at the apple").

Defendant argues that the Court should use its inherent power to reconsider the Holdback Order because she has shown good cause to vacate the Order, which she claims, "would require OPM to violate a governing statute." (ECF No. 478, at 4.) At oral argument, Defendant conceded that there is no controlling case law governing resolution of this issue nor is there an opinion letter or legal memorandum on this point from inside OPM, the Department of Justice, or, in particular, the Department of Justice's Office of Legal Counsel. (*See* ECF No. 474, at 9:18–10:6; ECF No. 471, at 23:19–24:3.) To be clear, the "good cause" that Defendant offers for why Defendant's position is correct and for why the Court's prior decisions are wrong is essentially an expanded *argument* that she already had the opportunity to make the first time around and did not, and then did modestly make in a footnote the second time around. And contrary to Defendant's assertions, the "governing statute" does not appear at all to compel the result she advances.

Defendant's timing causes concern. Defendant filed her Motion to vacate the Holdback Order more than three years after the holdback issue was originally litigated and decided, and Defendant first signaled her intention to file such Motion only right after the Court scheduled oral

argument on Plaintiffs' Motion now before the Court, a Motion aimed at bringing Defendant into conformity with this Court's Orders and the courses of action that Defendant had expressly joined in, including in the Notices that the Court's Orders directed. Though Defendant emphasizes that the Holdback Order left room for future modification and for the Court to reexamine the Order, at most, the language of the Holdback Order itself reveals that the Court had anticipated a potential need to modify the *amount* held back, not a need to reconsider the merits of implementing the holdback.

The Court will also briefly discuss Defendant's proposed alternative to the Holdback Order. At oral argument, the Court emphasized that if it were to consider modifying or vacating the Holdback Order, Defendant needed to provide financial and legal assurances that her proposed alternative was in fact lawful and enforceable, and that it provided at least a substantially equivalent level of security to Class Counsel for the payment of any counsel fees that might be awarded. (*See, e.g.*, ECF No. 474, at 53:6–54:23.)

Defendant says that she has "a means of paying a potential fee award that requires no common fund—and thus no holdback from payments issued." (ECF No. 465, at 10–11.) Defendant's plan is as follows: (1) upon an order vacating or modifying the Holdback Order, Defendant would start making full recalculated annuity payments, including retroactive payments (*id.* at 2); and (2) sufficient funding to cover any future attorney fees would "almost certainly" "exist" within the Trust Fund (ECF No. 483, at 7), which Defendant submits is the proper statutory source for any such fee award (ECF No. 465, at 15 (citing a 1972 U.S. Comptroller General decision pertaining to interest on retroactive retirement benefits).) Defendant would also commit to maintaining an accounting of payments and the total amount paid to all eligible Class members on an ongoing basis. (ECF No. 483, at 3.)

But Defendant's proposed alternative, which Plaintiffs oppose, lacks any legal assurances altogether. To the contrary, it teems with caveats and carve-outs. Defendant represents that if her Motion were to be granted, she would not oppose a potential attorney fee award—except "under the [] unique circumstances on the narrow grounds that full payments to eligible Class Members have exhausted the basis for a payment of attorney's fees as a factual matter." (ECF No. 465, at 3.) But Defendant also reserved "all other arguments" against any attorney fees. (*Id.*)

This dearth of commitment from Defendant stems from her own position that there is already substantial uncertainty over any eventual common fund attorney fee award, *i.e*, given that Plaintiffs' counsel should be very uncertain now of the funds being present and available to satisfy a future fee award, it really is not a problem if they remain equally very uncertain for other reasons. (*See* ECF No. 484-1, at 8.) So, in Defendant's view, because Class Counsel do not have any reasonable assurances of the funds from a "held back" amount ever being actually available in the federal Treasury and then committed for payment of any Court-ordered fee award as it is, the Court should have no problem endorsing Defendant's preferred alternative, which Defendant essentially concedes provides minimal to no legal assurances.[15] In sum and substance, the position of the Defendant appears to be that since Plaintiffs' counsel has little to rely on in terms of the ultimate payment of counsel fees with the holdback, they should be just fine with a substitute that is equally uncertain, and that the Court should therefore vacate its Holdback Order. The Court will not take the bait.

---

[15] This position is troubling. The federal government is in essence saying that if it holds back specific funds from a specific payment from the federal Treasury for the later making of a specific payment from the same federal Treasury, no one should count on that set aside money ever really being "there" when needed for its stated purpose. Defendant's primary argument about Class Counsel's lack of assurances regarding the Holdback Order currently in place is that even if the money was literally "there," the actuality of Class Counsel ever receiving such is ultimately illusory because of what Defendant says are statutory prohibitions on disbursement of monies withheld for fee awards. The problem here is that Defendant is thereby also admitting that similar legal concerns apply to her proposed alternative, and all without citation to any controlling decisional law, or even to a reasoned legal opinion from the Department of Justice.

In sum, Defendant's continued fight against the Holdback Order is a quintessential example of a party inappropriately "rehashing" the Court's prior decisions to dodge the commitments she made in numerous prior briefs and then in multiple notices that had been approved at her request by federal court orders.

In her original opposition to a holdback, Defendant modestly presented certain arguments to the Court. Those arguments failed. So, Defendant advanced a new argument in a footnote in subsequent briefing on the amount of the holdback. The Court was again unpersuaded. But now Defendant relies on this same argument again, hoping that maybe this time—years later and with only lightly expanded reasoning and with no citation to directly applicable precedential case law, or even a Department of Justice legal opinion as backup—it will stick.

And we should keep in mind that the Defendant never sought a stay of any of this Court's Notice orders, even when this Court expressly asked whether she would be doing so when the Defendant's appeals were filed. In fact, she affirmatively disclaimed that she would seek such a stay of any of them, or of the Notices and procedures set out in the Notices, or that her appeals acted to the same effect. Her recycled attempt to set aside the Holdback Order was filed only after this Court scheduled oral argument on Plaintiffs' Motion that seeks to force her compliance with this Court's Orders. And it comes after Defendant dispatched more than 10,000 notices to annuitants (or their representatives) that affirmatively stated that OPM would withhold 30% of retroactive lump-sum benefits the person is owed and would also actually calculate and pay these past and future enhanced benefits.[16]

Defendant's Motion is denied.

---

[16] More on this below.

**B.**     <u>**Plaintiffs' Motion**</u>

Turning to Plaintiffs' Motion for All Writs Injunction or Mandamus Relief, Plaintiffs essentially protest that enough is enough. Plaintiffs ask the Court to order Defendant to take the actions set out in the jointly submitted, Court-approved Notices sent to Class members. (ECF Nos. 428, 428-1.) Specifically, Plaintiffs ask the Court to direct Defendant to follow through on her representations to the Court and Notice recipients that she would review retirement files to confirm eligibility, recalculate annuities for eligible Class members, issue eligibility decisions to Class members and successors-in-interest, adjust monthly benefits prospectively, and pay retroactive benefits subject to the holdback. (ECF No. 428; ECF No. 437, at 14–15.) Plaintiffs also ask the Court to direct Defendant to provide Class Counsel with a copy of all Class member agency decisions and regular reports on OPM's progress until it is complete. (*Id.* at 15.)

In short, Plaintiffs ask this Court to now say that its Notice Orders meant what they said and that the Notices sent pursuant to those Orders gave "notice" of actual and true actions but which have yet to occur due solely to Defendant's refusal to act.[17]

Notwithstanding the Court's prior jurisdictional holding, which Plaintiffs acknowledge, Plaintiffs say that there are four (4) avenues under which the Court can grant some sort of the relief sought in Plaintiffs' Motion.

First, Plaintiffs argue that the Court should exercise ancillary jurisdiction and issue an All Writs Act injunction that directs Defendant to take the steps that OPM promised to take in the Court-approved Notices. They contend that such an Order is necessary to effectuate the notice directives granted by this Court's prior Orders and to vindicate the Court's authority.

---

[17] It would seem to the Court that a "Notice" of something that was not going to occur is not actually a "notice.".

Second, Plaintiffs argue that Defendant's promises in the Notices that Defendant helped draft and jointly submitted to the Court are binding commitments of the Defendant, and as such Defendant is estopped from abandoning them at this point.

Third, Plaintiffs argue that Defendant has no discretion to refuse to pay annuity benefits owed or to adjudicate claims and can be compelled to do so by writ of mandamus.[18]

Finally, Plaintiffs argue that *Leedom* jurisdiction,[19] which recognizes a narrow exception to a statute's implied withdrawal of 28 U.S.C. § 1331 jurisdiction where agency action is *ultra vires*, applies in this case. Defendant responds to and opposes each of Plaintiffs' arguments.

The Court finds Plaintiffs' first argument persuasive and will grant Plaintiffs' Motion on that basis, albeit on the terms as laid out below. The Court will thus not, at this point, address Plaintiffs' later arguments based on estoppel, mandamus, or *Leedom* jurisdiction.

### 1. Legal Background

Ancillary jurisdiction "recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994); *see also Butt v. United Bhd. of Carpenters & Joiners of Am.*, 999 F.3d 882, 887 (3d Cir. 2021) (a district court "may exercise jurisdiction to decide other matters raised by the case over which it would not have jurisdiction were they independently presented" (citing *Nat'l City Mortg. Co. v. Stephen*, 647 F.3d 78, 85 (3d Cir.

---

[18] Though the Court need not go into detail on this issue, it concludes that it is unnecessary to issue mandamus relief at this juncture. The mandamus statute, 28 U.S.C. § 1361, provides that "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." For mandamus to issue, the following is required: (1) a "right" that "is 'clear and indisputable,'" (2) "no other adequate means to attain the relief . . . desire[d]," and (3) "the writ is appropriate under the circumstances." *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (citation omitted). From where the Court sits, in light of the bases for the Court's decision here, providing mandamus relief applying that stated standard would require it to unnecessarily edge closer toward a ruling on the underlying merits of the Plaintiffs' request for recalculation that the Court has concluded it lacks jurisdiction to reach.

[19] *See Leedom v. Kyne*, 358 U.S. 184 (1958).

2011))). In discussing ancillary jurisdiction, the Third Circuit has stated that "the limits of a court's original jurisdiction do not define the limits of the court's subject matter jurisdiction." *Bryan v. Erie Cnty. Off. of Child. & Youth*, 752 F.3d 316, 321 (3d Cir. 2014).

The Third Circuit recently discussed "ancillary enforcement jurisdiction" to "clear up 'needless confusion'" in this area of law, noting that courts have "sometimes been imprecise when discussing ancillary enforcement jurisdiction." *Butt*, 999 F.3d at 886 (citation omitted). The Court explained that courts may exercise ancillary enforcement jurisdiction "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* at 887 (citing *Kokkonen*, 511 U.S. at 380). This proposition "has been applied consistently for over 200 years." *Id.* (citing cases); *see also id.* (citing *Bank of the United States v. Halstead*, 23 U.S. (10 Wheat.) 51, 53 (1825) ("The authority to carry into complete effect the judgments of the Courts, necessarily results, by implication, from the power to ordain and establish such Courts.")).

Relatedly, the All Writs Act states that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "The All Writs Act does not itself confer any subject matter jurisdiction, but rather only allows a federal court to issue writs 'in aid of' its existing jurisdiction." *United States v. Apple MacPro Computer*, 851 F.3d 238, 244 (3d Cir. 2017). "[A] court has subject matter jurisdiction over an application for an All Writs Act order only when it has subject matter jurisdiction over the underlying order that the All Writs Act order is intended to effectuate. Additionally, a federal court may only issue an All Writs Act order 'as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" *Id.* (citing *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977)).

2.   The Parties' Arguments

Both parties accuse the other side of ignoring, or openly defying, this Court's authority. Plaintiffs argue that the Court has ancillary jurisdiction, or, more precisely, ancillary enforcement jurisdiction, to act under the All Writs Act to protect its own jurisdiction by directing Defendant to do what she gave notice of to Class members in jointly submitted, Court-approved Notices. (ECF No. 437, at 18.) That is, the power to make the Notices the Court has jurisdiction to order "real" and have them provide "notice" of actual events. Under Plaintiffs' theory, the Court should exercise ancillary enforcement jurisdiction and issue an All Writs Act injunction to effectuate the notice relief granted by this Court's prior collective orders. (*Id.* at 18.)

Plaintiffs further argue that Defendant's refusal to do what she said she would in the jointly submitted and then Court-approved notices renders the Notices false and ineffective in terms of accurately conveying Class members' rights, the essential purpose of the "notice" that was ordered. (*Id.*) And in doing so, Plaintiffs assert that Defendant's actions (or, rather, intentional inactions) frustrate the effectiveness of the Court-ordered notice and impede the Court from resolving any outstanding issues in this case. (*Id.* at 18–19.) On top of that, as Plaintiffs see it, the Court needs to act to vindicate its authority because Defendant's "brazen" conduct is solely due to her disagreement with the Court's Holdback Order.[20] (*Id.* at 19.)

Defendant disagrees, asserting that Plaintiffs' arguments about ancillary jurisdiction are wrong for two primary reasons. (ECF No. 441, at 15–22.) First, she says that Plaintiffs' claim is not within the Court's ancillary jurisdiction because Plaintiffs' requested relief is unnecessary to

---

[20] Defendant does not contest that she is refusing to act in accord with the Notices solely because of the existence of the Holdback Order. What she does not adequately explain is why she is refusing to perform the annuity recalculations set out in the various Notices that she submitted to the Court for approval, and which were approved by Court Order, nor why she has refused to process and pay any forward-looking recalculated annuities to the rightful recipients. The Holdback Order relates only to the net amount of any one-time retroactive payment for past annuity payments, so its existence should have nothing to do with those other tasks.

carry out the Court's Orders. Defendant argues that notwithstanding their expansive and stipulated content, the Notices only served a narrow purpose to provide notice to Class members about the litigation and their potential eligibility for enhanced annuities. But the Defendant also says that she fully complied with the Court's Orders simply by sending out the Notices, whether or not she actually did (or ever intended to do) what the Notices told the recipients and the Court she would do, *i.e.*, whether or not they were actually "notice" of real and actual future action. Second, Defendant argues that the CSRA categorically precludes district court consideration of Plaintiffs' request, regardless of the jurisdictional source.

### 3.  The Court's Analysis

To begin, the Court notes, as it has previously explained (and as both parties seem to acknowledge), that it has held that there are limits to the Court's jurisdiction in this case. Namely, the Court lacks original jurisdiction to order recalculation and payment of increased annuities *vel non* as a merits determination of the claims in the Plaintiffs' Amended Complaint. Nothing in prior Orders or here changes this basic holding. But that premise does not foreclose Plaintiffs' Motion, as Defendant posits. As referenced, ancillary enforcement jurisdiction enables a court to vindicate its authority and effectuate its decrees even when it could not grant the same relief on the merits as a matter of original jurisdiction.

Plaintiffs' Motion then boils down to this question: Does Defendant's refusal to recalculate the amount of enhanced annuity payments to retired VA nurses (or their authorized representatives), or to make enhanced annuity payments (retroactive or forward looking), or to take any other action in conformity with the contents of the jointly submitted, Court-approved Notices—which refusal OPM now acknowledges is only because of the existence of the Court's

Holdback Order and the currently unresolved status of a future counsel fees award[21]—frustrate the Court's Orders to an extent that requires this Court's enforcement of its prior directives? The Court concludes that it does.

The Court starts its discussion with the following observations. First, the Court did not author the content of the submitted Notices or the JSRs; the parties did. Pursuant to the Notice Order and Opinion, the parties jointly prepared and submitted Notices and JSRs to the Court for

---

[21] The Defendant never advanced this self-generated connection between the existence of the Holdback Order and/or the future award of counsel fees and its compliance with the Notices when her lawyers were before this Court and had multiple opportunities to do so. Not once. Let's look at the record.

The Court held four (4) status conferences with counsel on the topic of the "Lists" and the Notices, each of which provided Defendant's counsel with the opportunity to raise directly with the Court any limitations (self-imposed or otherwise) on her proceeding as the Notices had advised the recipients of them. She never did, as set out below, and in fact she advised the Court as to all of the mechanisms and processes that the Defendant was implementing to fulfill the "procedures" set out in the Notices.

The first such conference was on August 16, 2017, seven days before the Holdback Order issued. (ECF No. 325.) At that conference, the discussion centered on the format and contents of "Lists" 1, 2, 3 and 4 and the topics of notice to and identification of the recipients of payments to survivors. The holdback motion was then pending and briefed, counsel acknowledged such to be the case, and counsel for OPM gave not a hint that the entry of any holdback order would impair the notice, recalculation or payment processes. (*See id.* at 14–26, 30–36.)

The next such conference was held on November 7, 2017. (ECF No. 344.) At that conference, the discussion focused on the transmittal of "List 3" and on-going consultation among counsel about "Lists" 2 and 4, and the concurrence of all counsel that OPM's then-recent filing of Notice of Appeal from six Orders of this Court relating to the Holdback Order would not in any way impair this Court's authority to supervise the notice/recalculation/payment process. There was no hint from OPM's counsel that the existence of the appeal, or of the Holdback Order, would impair those processes, nor any request that such processes or the Holdback Order be stayed. (*See id.* at 4, 7.)

The third such conference occurred on January 3, 2018. (ECF No. 378.) That conference was convened to discuss the notice mechanics and "List" development matters reported to the Court in ECF No. 345. The discussion focused on the mechanics of OPM printing, folding and mailing notices, OPM's desire to promptly send out "List 4" over the objections of Plaintiffs' counsel, and its plan to use a special LEXIS service to in effect do a "skip trace" to track down who should receive "List 4" notices. Once again, there was no hint from OPM's counsel that the existence of the Holdback Order would in any way slow down the notice/recalculation/payment processes. (*See id.* at 3, 6–7, 15–19, 31–32.)

Then, the fourth such conference was held on February 20, 2018. (ECF No. 379.) That conference focused on a discussion of "List 4", and possibly 4A and 4B, the methods by which OPM's physical document repository would be searched to unearth necessary records to use for providing notices, and confirmation that OPM would without further effort from any notice recipient review the files as to all "List 3" individuals and would do likewise as to those on "Lists" 2 and 4, if they returned the appropriate paperwork that would be included in the notices sent to them. Once again, not a hint that the existence of the Holdback Order would in any way impair the notice/recalculation/payment processes that OPM concurred in as part of the Notices submitted for Court approval by an Order. (*See id.* at 5–6, 13–21, 31–35, 45–49.)

the Court's approval, that is, they developed and submitted the form and content of the "notice" the Court had ordered. The Notices that counsel for the parties advanced to the Court included definitive, specific, and detailed forward-looking language. In the Court's original Notice Order, the Court had ordered counsel to "file a joint status report on the docket detailing the procedure for identifying and giving class and remedial (as to the Equal Protection claim) notice to class members and appending an agreed-upon form of such notice." (ECF No. 278, at 3.)

Defendant stresses that the Court ordered only a "narrow" scope of relief, requiring OPM to "simply" identify the Class members and give them notice of their potential eligibility for enhanced annuities or payments. (ECF No. 441, at 6, 17–18.) But to implement that directive, the parties were the ones who jointly included "procedures" in the Notices, laying out in detail that Defendant would act to recalculate annuities, issue decisions, and make payments (and that 30% of retroactive payments would be held back for potential attorney fees).[22]

Defendant's lawyers then reaffirmed those specific intentions in their multiple appearances before the Court in the conferences referenced above. And the Orders approving the party-submitted Notices approved their form, content, transmittal, *and procedures* on the terms the parties submitted and as submitted with only minor wordsmithing modifications suggested by the Court when it approved the Notices. (ECF Nos. 317, 349, 362, 395, 398, 433.)

When the Court considered and then acted by the entry of its Notice Orders in reliance on the form of the Notices and JSRs submitted to it and the affirmative representations of the

---

[22] In Defendant's supplemental briefing to the Third Circuit, Defendant argued that the Notice Orders interfered with OPM's relationship with annuitants by directing OPM to issue Notices that included a 30% holdback provision. Defendant characterized such provision as a "compelled statement." Supp. Brief for Appellant at 3, *Gorgonzola v. Weichert*, Nos. 17-3309, 18-1852 (3d Cir. Jan. 2019). To be clear, the parties were the ones that included reference to the 30% holdback provision in the Notices, not this Court and not by a prior directive of the Court. But once they put it in, the 10,000+ recipients of the Notices were "on notice" by the Orders of this Court that such would occur, that is if the Defendant actually did what she said she would do.

Defendant's lawyers, the Court took Defendant's representations at face value and concluded that the submitted form of Notices fulfilled the notice directives ordered by the Court. And when the Court issued the Notice Orders approving the Notices *and the procedures* set forth in the JSRs, the Court believed that such identified procedures would occur. And of course, any recipient of a Notice that said that it was issued under the authority of and at the direction of this Court would have reached that same conclusion.

So, it is fair to ask: Should a federal court assume that the Defendant federal agency head would knowingly insert detailed and express language in the Notices submitted to and approved by the Court by Order while simultaneously having the actual but undisclosed intent not to do exactly what they said?[23]

For her part, Defendant now somewhat oddly contends, both in briefing and at oral argument, that she and her lawyers actually have not breached the representations she made to the Court and the Notice recipients in the Notices and in proceedings before this Court. (*See* ECF No. 441, at 18; ECF No. 471, at 37:1–5.) Counsel for Defendant stated at oral argument before this Court, "we haven't not [] complied with what we said we would do in the notices. There was no temporal period that governed when we were going to do something." (ECF No. 471, at 94:24–95:2; *see also id.* at 37:1–5.)[24] Defendant thus suggests that her conduct remains consistent with the Notices (and therefore with this Court's Orders) because of Defendant's previously undisclosed and only more recently asserted plan to, at some point in the forever future and on her own (yet to be defined or disclosed) terms and timetable when the Holdback Order no longer exists

---

[23] Recall that submission to the Court of five of the six final notices came *after* the final Holdback Order was issued. If the existence of that Order was going to stop Defendant in its tracks, then that was the time for her to speak up. The Department of Justice lawyers representing the Defendant did not say a word in such regards in the four conferences with the Court noted above. Not one word.

[24] The Court notes that Defendant's proposed alternative to the Holdback Order also does not include a timetable.

and the counsel fees issue is "finally resolved," do what she said she would do. Thus, Defendant posits, she *has* complied with the Court's Orders because she mailed the Notices and might, someday, implement the procedures in the Notices as approved by Orders of this Court. But such a position simply does not track the reality of the circumstances before the Court, nor is it consonant with the real world in which people (including federal judges and those receiving the Notices) actually have to live.

For one, Defendant has now and belatedly made it clear that she would not issue any recalculated payments so long as they are subject to the Holdback Order. But the Notices directed by the Orders of this Court told Class members that 30% of payments would be held back from payments that would (presumably) be paid before the rest of the annuitants had died. To be sure, there was no caveat from the Defendant in those Notices, nor advanced by the Defendant's lawyers when they appeared before this Court at the four conferences noted above.

This, then, is where we are now: even though the Notices she helped author for the purpose of implementing this Court's Notice directive told the Class in no uncertain terms that recalculations and enhanced payments would automatically be made, and Defendant's counsel in multiple appearances before the Court never said a word to the contrary, Defendant now refuses to make *any* such recalculations, nor any payments, especially the ones that are subject to a one-time holdback.[25]

---

[25] Of course, Defendant could still get her way if she made no retroactive, lump-sum payments and just paid the "enhanced" prospective payments Congress said these VA nurses should get. Defendant apparently won't do that, even though doing that would not implicate any sort of holdback process, at least by the terms of the Holdback Order itself. So, the Defendant's non-fulfillment of the Notices actually goes beyond any "holdback" issue, and instead extends to not paying enhanced annuity benefits at all, or even making the recalculations that would be necessary to support them "someday." One might forgive members of the Class if they concluded that "while Washington fiddles, retired nurses wait," all with little apparent concern from the Defendant.

In other words, Defendant's assertion that OPM has not breached any representations to the Court and to the Notice recipients simply because it sent out the Notices and then might do those other things someday, on a date of its own choosing, is contradicted by her own statements to the Court and in the Notices. In fact, Defendant is, in the Court's estimation, now so open about her opposition to the Holdback Order and the substantive content of the jointly submitted and Court-ordered Notices (and her lawyers' representations to this Court) that it is as if she believes that this Court "issued an advisory opinion, and that faced with a conflict" between the Court's judicial decision and her own views, she should follow the latter. *Baez-Sanchez v. Barr*, 947 F.3d 1033, 1036 (7th Cir. 2020) (Easterbrook, J.). To quote Judge Easterbrook, this position "beggars belief." *Id.* at 1035.

Moreover, as Plaintiffs point out, making retroactive payments (that is, the only sort of payments that would be subject to the Holdback Order) is not the only "noticed" action that Defendant has failed to undertake. The Notices represented, for example, that Defendant would issue determination letters and pay increased prospective benefits. None of that has happened, and none of that has anything to do with the Holdback Order.[26] To be sure, Defendant argues that the Holdback Order prevents OPM from fulfilling those promises too. At oral argument, counsel for Defendant mused, "[a]s long as OPM is under a legal impediment that prevents it from bringing her accounts to square, it's very difficult. I think legally, administratively and in a lot of other

---

[26] In the parties' latest JSR submitted after the oral argument, for example, Defendant represented that some additional steps must be completed before OPM can issue eligibility determinations to List 1 annuitants deemed eligible. (ECF No. 483, at 2.) She further stated that she "anticipates that [OPM] will begin issuing [List 1] initial decisions of ineligibility soon." (*Id.*) Given the history recited here, the Court remains most skeptical that such action will ever occur without this Court enforcing its prior Orders. Plaintiffs also highlight that there are individuals outside the Class who have yet to be paid and who are owed benefits without the condition of any sort of holdback. (*See id.* at 10, 12 n.7.)

respects, it's very difficult if not impossible for OPM" to take other actions without "squar[ing]" the accounts of Class members. (ECF No. 474, at 4:16–9:17.)

Defendant's counsel's quibbling with the Court was speculative at best and relied on no facts in the record nor cited to any applicable case law, statute, or regulations.[27] The fact of the matter is that at this point Defendant has not acted in line with the content she agreed should be in the Notices and as approved, at her request, by this Court.

To be clear, as a logical matter, all of this means that there are two possible explanations for Defendant's current position: (1) from the outset, Defendant did not have an intention of doing what she said she would do in the jointly submitted, Court-approved Notices; or (2) at some point along the way Defendant, on her own accord and without informing or consulting the Court, decided to backtrack on the substance of what she included in the jointly submitted, Court-approved Notices and that which her lawyers reaffirmed in four (4) conferences before this Court. Notices that were, by Order, issued in the Court's name.

Either path is inconsistent with a litigant's obligations in the context of Court-ordered Notices because they boil down to either a bait and switch on the Court and the Notice recipients or a unilateral about-face after the Notices went out. As to the actions the Notices provided "notice" of, the Notices were either not true when submitted to and then approved by the Court and then transmitted to the Class or they were rendered so by the Defendant's subsequent inaction and without the Court's permission after they were Court-approved and sent off to the homes of thousands of aging nurses. In the Court's estimation, either path is out of bounds before a federal

---

[27] For support, counsel for Defendant argued that two statutory provisions (5 U.S.C. § § 8345(b), 8461), when read together, show that an annuity is one lifetime benefit. As a legal matter, he contended that OPM was legally prohibited from making prospective payments "for the very same reason that it is legally prohibited for OPM to issue a payment of back retroactive benefits." (ECF No. 474, at 9:15-17.) No case law or Department of Justice formal legal Opinion was offered in support of those conclusory assertions.

court, and certainly at least this one. And it is in the Court's judgment all the more unprecedented when it is the path taken by a duly sworn, Senate-confirmed, high-ranking federal officer represented by the Department of Justice.

On that last point, an important aside is in order. From the Court's perspective, based on the record before the Court, the Defendant's course of conduct and the litigation conduct of her counsel have neither been directed by nor concurred in by the United States Attorney for this District, nor her Assistants. Responsibility for these arguments lies squarely in the Nation's Capital. Here's why that is so.

At the inception of this case, and for several years thereafter, the interests of the Defendant were represented by the then-United States Attorney for this District and one of his Assistants. In late October 2014, it became apparent that those lawyers were being sidelined by decision makers in Washington. A status conference was convened with then-counsel, and at that time the then-Chief of the Civil Division for the United States Attorney's Office advised the Court that they would move to a subsidiary role, (ECF No. 166, at 11:9-11), and that the Defendant would be undertaking a considerably more "aggressive" litigation posture to be advocated by counsel from "Main Justice", one that would be a "sea change" in OPM's approach to this litigation. (*Id.* at 12: 8 to 13:15.)[28] And the Court was advised that the lead local Government lawyer (an Assistant United States Attorney for this District), who in the Court's estimation had thoughtfully, vigorously, and zealously represented the Defendant up until that point, was coming off of the case. (*Id.* at 16:13-17.)

Given that turn of events, the Court thereafter set a further in-person status conference and directed that all counsel (including the new Main Justice counsel) were to confer and identify a

---

[28] There are no lawyers from the United States Attorney's Office for this District who have open entries of appearance for this action on the docket, and that has been the case since shortly after that conference.

date for the conference that would work for the parties. This was important because the Court entered an Order on November 3, 2014 that required the Defendant and her lawyers to do three (3) things: the new Main Justice lawyers were to enter their appearances promptly; the parties were to file a status memorandum to which Defendant's counsel were to append a list of all OPM decisionmakers who were steering this "sea change" and more aggressive litigation effort, with each decisionmaker listed by name and title; and any lawyer or principal whose position was to be considered by the Court was to attend that conference in person.

In response, Defendant's new Washington, D.C.-based lawyers entered their appearances, the local Government counsel withdrew theirs, and then OPM's new lawyers promptly ignored the balance of the Court's Order. No listing of OPM decisionmakers was appended to the Defendant's filing, and no one, other than lawyers from Main Justice, attended the in-person conference. The Defendant's lawyers apologized to the Court, writing those inactions off as some sort of a "misunderstanding" and a "judgment error." (ECF No. 176, at 6:6-12, 8:2-15.)

With the benefit of hindsight, it should have been apparent to this Court back then that the Defendant was seemingly comfortable in viewing the Orders of this Court, including the Notice Orders that she later concurred in this Court entering, as more akin to suggestions than directives. This approach was also revealed when the Defendant, via her Main Justice lawyers, also advised the Court that the Court should not and could not rely on the representations that had been made to the Court by her lawyers from the Department of Justice, (ECF No. 255 at 18). It was also evident when OPM took the position that it would take the recalculation and payment actions it had advised the Court it had been anxiously awaiting to take but for the Rule 23(d) Order but then would do so only in a wholly illusory fashion, namely that OPM would take the actions it told this

Court it was anxious to take only if there were no "unexpected changes" in the involved operating budget and staffing levels. (ECF No. 140 at 3.) *See Gorgonzola I*, 2017 WL 1449789 at *4, n. 4.

And all of this appears to the Court to be part of a larger whole. Throughout the life of this case, OPM and its various Directors have evinced a pattern of vigorous avoidance to paying aging VA nurses what OPM has long acknowledged the nurses are legally entitled to receive so long as this lawsuit existed. This course of conduct has revealed itself in different stages and is detailed in this Court's four prior Opinions.

First, early on OPM's position was that it would provide a recalculation of statutorily enhanced annuity benefits only to those retired nurses who knew to affirmatively and specifically ask OPM to do so, even though they were not lawyers, nor were they schooled in the law but were instead skilled nurses who had retired after years (if not decades) of addressing the health needs of the women and men who had nobly served our Nation in its Armed Forces. In other words, as this Court characterized it in its first Opinion in this case, it was OPM's own version of "double secret probation." (*See* ECF No. 128, at 24 n.19.)

Second, OPM thereafter pressed to the Court its willingness to perform the statutorily directed recalculations—but only so long as the Court was not involved in this litigation *and* if there were no changes in its budget and staffing that *it* concluded would cause OPM to change its mind entirely. (*See* ECF No. 277, at 32; ECF No. 140 at 3.)[29]

And then third, we come to where we are now, with OPM refusing to make the Notices issued in the name of this Court, as directed by the Orders of this Court, be Notices of something that would actually occur, all because OPM objects to the Holdback Order and now also wants to

---

[29] And as noted above, by 2017, the Defendant sought to backtrack even on that position, engaging in revisionist history as to OPM's many statements of position in this litigation that it would take those steps because it was both desirous of doing so and was obligated to do so. *See Gorgonzola I*, 2017 WL 1449789, at *4.

wait until the question of counsel fees is "finally" decided. And as noted by the Court's reference to its prior Orders as to these OPM positions, this Court has previously noted and described each of OPM's prior stages of avoidance and sidestepping OPM's commitments and this Court's Orders in those numerous Opinions, all seemingly without any impact on OPM's decisional processes.

In Defendant's view, though, it doesn't matter if Defendant doesn't do what she provided notice that she would do in the Notices. This is because she says that the Court simply lacks the power to do anything about it. Courts only have ancillary enforcement jurisdiction to enforce judicial decrees and orders, and Defendant says that the Notices and the content in them are not judicial decrees or orders. Defendant argues that because Defendant actually transmitted all the Notices, she therefore actually fully complied with all relevant Court Orders even if she has taken none of the actions ("procedures") she repeatedly told the Court and the Notice recipients she would take, and that she has no intention of doing so in anything resembling the foreseeable future.

Boiled down, the Defendant's position in these regards is that since the Notices were actually physically sent in the Court's name and at its direction to the tens of thousands of nurses or their representatives on the Lists, it matters not at all if the Notices simply were not true and accurate in their content – content the Defendant advanced to the Court in the joint filings that led up to those Orders and Notices and then had reaffirmed via counsel in multiple proceedings before the Court.

That argument will not carry the day with the Court.

Defendant looks to *Kokkonen v. Guardian Life Insurance Company of America* for support. *See* 511 U.S. 375 (1994). There, the parties entered into a settlement agreement and then executed a Stipulation and Order of Dismissal with Prejudice. *Id.* at 376–77. The district court signed the Stipulation and Order under the notation "It is so [O]rdered." *Id.* at 377. The order did not refer to

the settlement agreement. *Id.* When the parties disagreed about their obligations under the settlement agreement, the respondent moved the district court to enforce the agreement. *Id.* at 377. Asserting its inherent power, the court entered an enforcement order. *Id.* The petitioner appealed, arguing that the court lacked jurisdiction to enter such an order. *Id.* The Court of Appeals affirmed. *Id.* The Supreme Court reversed, concluding that ancillary jurisdiction did not apply in that instance. *Id.* at 380–81.

In reaching that conclusion, the *Kokkonen* Court first set the parameters of ancillary jurisdiction, noting that courts assert such jurisdiction for two purposes, one of which is to "enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* at 380. But the Court determined that the only order in the case before it was for the suit's dismissal, which was "in no way flouted or imperiled by the alleged breach of the settlement agreement." *Id.* The court noted that the circumstances would have been different if the terms of the settlement agreement had been incorporated into the order. *Id.* at 381. The district court's "mere awareness and approval" of the terms of the settlement agreement did not suffice to make them part of its order. *Id.* at 381.

But *Kokkonen* is helpful here only insofar as it discusses the bounds of ancillary jurisdiction generally. In that sense, *Kokkonen* clarifies that a court may exercise ancillary jurisdiction to vindicate its authority, protect its proceedings, or effectuate a judicial order. *Id.* at 380. But as Plaintiffs highlight, central to the Supreme Court's holding in *Kokkonen* was that the parties there had dismissed the case, which meant that the district court lacked any basis to predicate ancillary jurisdiction. *See Bryan*, 752 F.3d at 322; *see also T St. Dev., LLC v. Dereje & Dereje*, 586 F.3d 6, 10 (D.C. Cir. 2009) (noting that the "distinction is critical.") And the Third Circuit has recognized that *Kokkonen* "does not yet have bearing" on disputes where the parties had not dismissed their

suits. *Bryan*, 752 F.3d at 322 ("*Kokkonen* does not yet have any bearing on this dispute. In *Kokkonen*, the parties had dismissed their suit; in this case, the parties had not. . . . The absence of an ongoing matter within the district court's original jurisdiction left the district court in *Kokkonen* without any basis on which to predicate ancillary jurisdiction.").

Here, this Court retains its original jurisdiction over Plaintiffs' notice claims. (*See, e.g.*, ECF Nos. 277, 278.) The case is very much alive on the Court's docket.[30] And when matters "incident to the disposition of the primary matter" arise before a court, the doctrine of ancillary enforcement jurisdiction permits district courts to decide them, meaning that "the limits of a court's original jurisdiction do not define the limits of the court's subject matter jurisdiction." *Bryan*, 752 F.3d at 321 (citation omitted); *Butt*, 999 F.3d at 887; *Loc. Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934) (recognizing ancillary jurisdiction "irrespective of whether the court would have jurisdiction if the proceeding were an original one").

On this point, Defendant objects to Plaintiffs' reference to *City of Cherokee v. Interstate Commerce Commission* as inapplicable. *See* 671 F.2d 1080 (8th Cir. 1982). In that case, the Eighth Circuit reasoned that even though certain agency decisions were "generally not reviewable," the court had ancillary jurisdiction to review an agency decision to the extent necessary to protect against interference with the court's jurisdiction. *Id.* at 1083. The court explained that the power to review arises in such circumstances "out of necessity." *Id.* Defendant contends that this case is different than *City of Cherokee* because OPM's "failure to immediately recalculate annuities for eligible Class members is not the functional equivalent of OPM failing to send out the required Notices."[31] (ECF No. 441, at 20–21.)

---

[30] In the Court's Notice Opinion, the Court explained that it "retain[ed] jurisdiction over the parties and over the notice issue . . ." (ECF No. 277, at 13, 25.) Nothing has changed in those regards.

[31] Defendant's focus on the word "immediately" is beside the point. Defendant has taken *no* action in accordance with the Notices, and the arguments advanced by her lawyers have made it plain to the Court that OPM necessarily either

Defendant's argument is unpersuasive. The Court cannot identify an easy analogy to the circumstances now before the Court, given what is for this Court the unprecedented position of the Defendant and the oddity of her argument that she has actually fully complied with the Court's Orders even though she has not done the things stated in the Notices approved and issued based on filings that she concurred in and that the Orders directed.

Importantly, Plaintiffs' position here is not premised only on OPM's "failure to *immediately* calculate annuities." Rather, it is that OPM told the Court that it will *never* recalculate annuities in the manner set forth in the Notices that it prepared and submitted to the Court and then transmitted to the Class in the name of the Court, so long as the Holdback Order exists. The Defendant now also reinforces its terms of refusal with the added proviso that OPM will not pay any enhanced annuity benefits, even prospective benefits not subject to the Holdback Order, until the issue of Plaintiff's counsel fees are both "fully" and "finally" resolved.

The Court can thus fairly and easily conclude that Defendant's interminable inaction now, amplifying and furthering her prior treatment of the directives of this Court as some sort of elective activities, frustrates the effectiveness of the Court-ordered Notices and thwarts their purpose. After all, the position Defendant now takes means that the Notices that were sent in the name of the Court at the behest of the parties including the Defendant were in actuality Notices of actions that would not occur. That, for sure, is not what this Court previously ordered.

Further, Defendant views the Notices that this Court ordered far too narrowly. Defendant, for example, emphasizes that the Third Circuit, in holding OPM's appeal moot, noted that Defendant had complied with the Notice Orders. *See Gorgonzola*, 782 F. App'x at 212; *see also*

---

had no intention of doing so, or would only do so at some, undefined, long-away date of its own choosing, *e.g.*, if and when it was good and ready. Neither premise was an express or implied predicate to any of this Court's Orders.

*id.* at 213 ("the notice orders have run their course and cannot cause any additional harm to OPM.")[32] But it is not just the existence of the Notice Orders that is relevant to this discussion, but the purpose of the Notice Opinion and Order as well. The purpose of the Court's notice directive has not been fulfilled if it turns out that the Notices were deceptive and misleading (or more precisely, vacuous in regard to the occurrence of the actual annuity recalculation and *future* payments that the *Defendant* joined in asking be referenced in the Notices).

When Defendant informed the Court in the Joint Status Reports relevant to each Notice that she would take certain steps ("procedures")—and then the Court approved by Order the forms relaying those certain steps to the Class—it was the Court's expectation that OPM would follow through on those "procedures".

And then in four separate conferences with the Court, not once did Main Justice counsel for the Defendant do or say anything other than that the Defendant would proceed apace with the content of those Notices. That is, that the Defendant actually would do and was doing what the Notices were "notice" of.

And when she filed her multiple appeals, and this Court affirmatively asked if those appeals either stopped this case in its tracks pending the disposition of those appeals, or whether the Defendant would seek to stay this proceeding pending the outcome of those appeals, the Defendant's answer was "no" to both questions.

This Court would not have approved the Notices had it known Defendant had no intention of abiding by what was "noticed" or alternatively would after the Court's approval unilaterally decide to not engage in any of the substantive actions or "procedures" that the Notices she had concurred in had described. That surely would have amounted to "notice" of not much of anything,

---

[32] This statement by our Court of Appeals appears to this Court to be far short of the merits endorsement of the Defendant's conduct that the Defendant says that it is.

and therefore would not really be a "notice" at all. After all, what federal court would have approved the Notices if it knew that such were the Defendant's unspoken premises for them? Certainly not this one.

Defendant then makes an alternative argument that the CSRA precludes ancillary enforcement jurisdiction, no matter what. (ECF No. 441, at 21.) Defendant argues that because the CSRA provides the exclusive avenue to judicial review, that scheme categorically precludes district court consideration of Plaintiffs' current request regardless of the jurisdictional source they invoke. (*See id.* (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012)).)

By this argument, the Defendant makes patent what may have been latent—her view that this Court possesses no authority to enforce its own Orders at least as to her, thus meaning that as a practical matter the Defendant is free to disregard them as she sees fit since she could suffer no consequence for doing so. But the two cases that Defendant relies on to support this broad assertion do not consider ancillary enforcement jurisdiction at all. *See Elgin*, 567 U.S. 1; *Adorers of the Blood of Christ v. Fed. Energy Regul. Comm'n*, 897 F.3d 187 (3d Cir. 2018).

In *Elgin*, for example, the Supreme Court held that the CSRA's "exclusivity does not turn on the constitutional nature of an employee's claim, but rather on the type of the employee and the challenged employment action." 567 U.S. at 15. That conclusion stems from a discussion of the courts' original jurisdiction in such matters. *Elgin* thus does not prevent the Court from exercising ancillary enforcement jurisdiction in this case.

*Adorers* does not help Defendant either, as the Third Circuit there focused on a statute's exclusivity provision in the context of claims brought by invoking the court's general federal question jurisdiction. *See Adorers of the Blood of Christ*, 897 F.3d at 190. The court held that a Religious Freedom Restoration Act cause of action, "brought pursuant to the general jurisdictional

grant of a federal question under 28 U.S.C. § 1331, does not abrogate or provide an exception to a specific and exclusive jurisdictional provision" in the Natural Gas Act. *Id.* at 198. That decision is inapposite to the issues currently before the Court. What's important here is that Plaintiffs' Motion now before the Court was brought under ancillary enforcement jurisdiction.

At bottom, this last argument from the Defendant is that this Court has no power to enforce any of its own Orders, at least not the ones that apply to her. But that is not how our legal system works. After all, as the Supreme Court made plain a very long time ago, when faced with a trial court order with which a party disagrees, the party's remedy is to take an appeal or seek a stay,[33] even if the court issuing the order was ultimately without jurisdiction to enter the underlying order. *See Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967) ("It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected."); *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983) ("It is beyond question that obedience to judicial orders is an important public policy.").

And our Court of Appeals has vigorously applied those same principles. *See United States v. Stine*, 646 F.2d 839, 845 (3d Cir. 1981) ("It is fundamental to our legal system that 'all orders and judgments of courts must be complied with promptly. If a person to whom a judge directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.'" (citing *Maness v. Meyers*, 419 U.S. 449, 458 (1975))); *Bethlehem Mines Corp. v. United Mine Workers of Am.*, 476 F.2d 860, 864 (3d Cir. 1973) ("The integrity of the judicial process demands compliance with court orders until such time as they are

---

[33] Recall that the Defendant affirmatively advised the Court when she filed her Notices of Appeal aimed at the Holdback Order that that appeal did not act as a stay of any Order of this Court nor of the notice process, and she was seeking none from this Court.

altered by orderly appellate review. . . . No one, no matter what his position, nor how virtuous his impulse, was to be a judge in his own case. . . . Jurisdictional controversies are hardly appropriate for final determination by the self-interest of a party. . . . Only when a court so obviously journeys outside its prescribed range as to be usurping judicial form may an order issued by it be disregarded. Whether a party may be called to the bar of justice is not for that party, himself, to decide.").

Defendant has pointed to no exception to that rule that justifies or supports her failure to fulfill in full the terms of the Notices that she concurred in including in the Notices provided to the Plaintiff Class in the name of and by the Order of this Court, and that in conferences with the Court her lawyers then said she would do. And the Court knows of none.

The Court therefore concludes that it is both proper and essential to exercise ancillary enforcement jurisdiction here and issue All Writs Act relief. Doing so is necessary to effectuate the notice directive that this Court ordered and to protect the integrity of its lawfully entered orders. *See United States v. N.Y. Tel.Co*, 434 U.S. 159, 172 (1977). Defendant's refusal to act in accordance with the approved Notices imperils the Court's proceedings by misleading or deceiving the Class members and doing so in the Court's name. After all, the Notices accurately declared that they were authorized by this Court and were, and said they were, transmitted pursuant to this Court's Orders. Defendant's self-generated course of conduct frustrates this Court's Orders and erodes the Court's authority.

As a result, the Court will exercise ancillary enforcement jurisdiction and issue an All Writs Act Order that requires OPM to take no actions that impair the prompt conduct and completion of the actions set out in each of the Notices, nor fail to take any actions necessary and proper to the

accomplishment of the same, and to forthwith implement each and all of the actions she set out in the Notices approved and transmitted to the Plaintiff Class by this Court's Orders.

## III.   **CONCLUSION**

It might be tempting for some considering the Court's Opinion to conclude that it simply reflects a degree of frustration on the Court's part with the state of affairs addressed here and as generated by the Defendant. Reaching such a conclusion would be inaccurate and would both minimize and do an injustice to the necessity for litigants to fulfill their representations to the Court and to the members of the public to whom notice has been given in the Court's name, and to then abide by the Orders of a federal court. And it would fail to account for what can fairly be described as the Defendant's open disregard for the Court's directives and the law's expectation that they will be followed unless and until vacated or reversed.

This decision is not about any frustration that the Court might harbor,[34] but is instead about the obligation of litigants, and in particular a high officer of the United States represented by lawyers from Main Justice, to respect the orderly administration of the rule of law as exemplified by the extant Orders of this Court.

For the reasons set forth in this Opinion, Defendant's Motion (ECF No. 462) is denied. Under the Court's ancillary enforcement jurisdiction and All Writs Act authority, Plaintiffs' Motion (ECF No. 428) is granted as follows.

The Director, or acting Director as the case may be, of the OPM will be directed to take no actions that in any way interfere with the prompt and immediate conduct and conclusion of each

---

[34] And the Court harbors none. Is the Court surprised that the Defendant, a high-ranking policymaking federal officer, would proceed as set out above with regard to statutory benefits concededly owed to retired VA nurses who devoted their lives to ministering to the needs of wounded and disabled veterans of the United States military, yes the Court is quite surprised by that course of events. Is the Court dismayed that the Defendant would affirmatively advise the Court that she would not seek a stay of the Court's Orders, and then fail to fulfill the terms of the Notices the Court ordered with her concurrence by her instead implementing her own self-generated "stay," yes, the Court is both dismayed and disappointed to be sure. But mere judicial frustration, no.

and every action contained in each and every one of the Court-approved Notices sent to Class

members (including to surviving spouses and other beneficiaries) pursuant to the Court's Notice

Orders, and any further Orders of this Court as may be entered on these matters—including the

provisions of such Notices that state that Defendant will review files, determine eligibility, issue

eligibility decisions, recalculate annuities for Class members whom OPM determines are eligible

for recalculation, adjust annuities prospectively, and pay any retroactive benefits that OPM

calculates are due, all subject to this Court's Holdback Order (ECF No. 318)—nor shall they fail

to immediately take any and all actions necessary and proper to forthwith accomplish the same,

and they forthwith shall take all such noticed actions.

    An appropriate Order will issue implementing this Opinion.

                                           Mark R. Hornak
                                           Chief United States District Judge

Dated:  March 16, 2022